STATE OF IOWA, Appellee, v. MATT M. MELIA, Appellant.

No. 45749.

DECEMBER 9, 1941.

Johnston & Shinn, for appellant.

John M. Rankin, Attorney General, Jens Grothe, Assistant Attorney General, and Clarence A. Kading, County Attorney, for appellee.

HALE, J.—The defendant, his brother Joe Melia, and Joe's wife, Josephine, lived in the same farmhouse in Marion county. The farm was rented by Joe Melia, and was situated about a half mile south of highway No. 60, on a dirt road. Matt M. Melia, the defendant, was single, and resided with the family, working at times at coal mining. On the 29th and 30th days of July, 1940, Joe Melia worked at the mine and his wife Josephine and brother Matt were at the farm together. It is alleged by the defendant that the two brothers were to share in the proceeds of the farm. Some business transactions had occurred, previous to the difficulties which arose between them which resulted in the killing of Joe Melia and his wife Josephine. Joe Melia was a large man and his brother, the defendant in this case, was considerably smaller. About 7:30 in the evening of July 30, 1940, Joe was returning to his home and met a neighbor girl. Shortly after this meeting the girl and her sister heard five reports of a shotgun at short intervals, at the Melia residence, which were also heard by another neighbor. About 2:30 o'clock in the morning of July 31, the defendant Matt M. Melia approached the night marshal at Knoxville and said that he had to be put in jail, and in answer to the marshal's inquiry, told him that he had shot his brother and sister-in-law and thrown them in a 64-foot well. The defendant was placed in a cell; the sheriff was called and defendant stated the same thing to him, describing the weapon, a double-barreled shotgun which he had left at home. The next morning the sheriff, with a photographer and a well digger, recovered the bodies of the husband and wife from the well and they were taken to an undertakers in Knoxville. A search of the premises disclosed some empty shotgun shells, a woman's shoe near the house, a

pair of men's shoes or slippers, and a bloodstain on the ground. The four-room dwelling house had a porch at the south end, located two or two and a half feet above the surrounding ground which sloped towards the east. Wounds caused by the discharge of the shotgun were found in the bodies of both persons, in the back of Joe's head and in his chest. Two wounds were found in the body of Josephine, one higher than the other, the upper wound being between the breasts and over the median line of the breastbone. The course of this wound was upward and toward the left. The other wound was a little lower and to the left of the first one, in the upper portion of the left breast, and the direction of this wound was up and towards the right. There were no punctures or scattered shot wounds around the place where the charge had penetrated.

According to defendant, who testified at the trial, there had been difficulties between the two brothers in regard to money matters, the stock on the place, and the manner of feeding. Defendant says that his brother claimed the sole ownership in the hogs and corn, cursed him, reminded him that he had already given him notice to leave the place, and stated that he was now going to kill him. Defendant states that Joe picked up a club and started for the defendant and defendant crawled through the fence and ran down the road towards the house, and that Joe said there was no place where he could go to save his life, that he would get him wherever he would go. Defendant says that he turned into the small gate and went to the house, seized the loaded double-barreled shotgun from its place near the door, picked up some shells and put them in his pocket, and came back on the porch. His brother approached him; he warned his brother, but he continued coming towards him, and when he was within a few feet of him the defendant raised his gun, pointed it at his brother and fired, and in his excitement and fear, pulled both triggers at practically the same instant of time. Josephine, without the knowledge of defendant, had rushed in front of her husband and received two shots in the breast. Defendant continued shooting at Joe Melia until the latter was killed. He then concealed the bodies in the well, replaced the boards, and wandered about the premises until he finally made up his mind to go to Knoxville

and report to the sheriff. He had intended to stop at his brother-in-law's house, but concluded not to tell him what had happened. He drove in the rain, and for quite awhile sat in the rain until the storm had ceased, and then drove on to Knoxville.

There were two indictments found against him, one for the murder of Joe Melia and one for the murder of Josephine Melia, to each of which he pleaded not guilty. He was tried first on the indictment charging the murder of Joe Melia and was found not guilty. Being placed on trial at the December 1940 term of court, for the murder of Josephine Melia, the defendant, in his plea of not guilty, made the additional plea of former acquittal. The jury disagreed. He was again placed upon trial and a verdict of guilty of manslaughter was returned. Motion for new trial and exceptions to instructions were filed and overruled. Defendant was sentenced under the verdict and he appeals.

Defendant makes numerous assignments of error, not all of which we need consider. Objection is made to various instructions. He claims also that the court erred in overruling the motion of defendant for dismissal and directed verdict, since he had previously (case No. 2682) been tried and acquitted for the murder of Joe Melia, and that the time, place, and circumstances attending that slaying were identical with those attending the slaying of Josephine.

I. The five shots, according to witnesses, were fired very close together, and the contention of the defendant is that it was actually one act, and that, under the Constitutions of the United States and of Iowa, the present trial was a violation of the defendant's right not to be tried twice for the same offense; or, in the language of the United States Constitution (amendment 5): "* * * nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb;" and under the Iowa Constitution (Art. I, sec. 12): "No person shall after acquittal, be tried for the same offence." The same protection is given to the accused by Code sections 13457, 13807, and 13808. Were, then, the trial and acquittal as to Joe Melia a bar to a subsequent trial for the killing of Josephine? There is no ques-

tion about the right that the defendant enjoys to be free from a second prosecution for the same offense, but the question is as to what constitutes the same offense.

The text of 15 Am. Jur. 65, 66, section 390, is as follows: "The conviction or acquittal of one charged with the murder of, or an assault upon, one person is not a bar to his subsequent prosecution for the murder of, or an assault upon, another person at the same time where the two offenses were due to separate acts; * * *. An exception to the general rule is made in some jurisdictions in cases where the assault upon, or the murder of, two or more persons is committed by one and the same act, as, for example, by the single discharge of a firearm or by one stroke of a knife or other similar weapon." Much confusion has arisen in the application of these rules, arising in some cases from not distinguishing between one act and one offense. The Federal Constitution, and our own State Constitution, as well as the statutes, prohibit double jeopardy *for the same offense.* The distinction is made in numerous cases, and is expressed in Gavieres v. United States (1911), 220 U. S. 338, 31 S. Ct. 421, 55 L. Ed. 489, where it is held that a conviction or acquittal upon one indictment is no bar to a subsequent conviction and sentence upon another, unless the evidence required to support a conviction upon one would have been sufficient to warrant a conviction upon the other; and that the test is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense.

In State v. Fredlund (1937), 200 Minn. 44, 52, 273 N. W. 353, 357, 113 A. L. R. 215, it is held that: " 'It is the identity of the offense, and not of the act, which is referred to in the constitutional guaranty against putting a person twice in jeopardy. Where two or more persons are injured in their persons, though it be by a single act, yet, since the consequences affect, separately, each person injured, there is a corresponding number of distinct offenses.' " It should be stated, however, that the position taken by the Minnesota court is not that of all the courts, where the decisions are very much in conflict. In the annotation to the Minnesota case, found in 113 A. L. R. 222, the annotator states that: " * * * the following later decisions may be cited as supporting, or at least recognizing as applicable under some con-

ditions, the general rule stated in the earlier annotation (20 A. L. R. 341) to the effect that the conviction or acquittal of one charged with the murder of, or an assault upon, one person, is not a bar to his subsequent prosecution for the murder of, or an assault upon, another person at the same time.'' Cases cited include those of Alabama, California, Florida, Illinois, Kansas, Kentucky, Louisiana, Minnesota, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Washington, and West Virginia. Some courts extend this doctrine of distinct offenses to situations where the results to different individuals were brought about by a single wrongful act, as a single shot or blow. See annotation to State v. Fredlund, supra (113 A. L. R. 222 et seq.). And see Spannell v. State (1918), 83 Tex. Cr. Rep. 418, 203 S. W. 357, 2 A. L. R. 593, cited by defendant, and which was a case where the defendant was tried and acquitted for the murder of his wife, which, from the record, was an accident. The holding of the court was that a series of shots might constitute but one act, and the plea of former jeopardy was sustained. There are other authorities holding to the same effect.

Other cases hold to the contrary view, as in the case of People v. Brannon (1924), 70 Cal. App. 225, 233 P. 88, where the defendant was indicted for assault with a deadly weapon upon one person, and also for the murder of another, where there was but one shot fired. The opinion reviews various authorities on this subject and cites the holding of the various states under such circumstances. Included among the states which hold that there is but one offense is Iowa, but other jurisdictions hold that there are two offenses, including among the latter the Spannell case, supra. And, citing a former California case (People v. Majors, 65 Cal. 138, 3 P. 597, 52 Am. Rep. 295) as the rule in that state, the opinion quotes at page 230 of 70 Cal. App., page 90 of 233 P.: '' 'We have attempted to show that the better rule, and that established by the great weight of respectable authority, is that the murder of two persons, even by the same act, constitutes two offenses, for each of which a separate prosecution will lie, and that a conviction or acquittal in one case does not bar a prosecution in the other.' '' See also, People v. Cygan (1924), 229 Mich. 172, 200 N. W. 967, citing

Hotema v. United States, 186 U. S. 413, 22 S. Ct. 895, 46 L. Ed. 1225.

It is apparent that the courts are in conflict on this question and it would serve no useful purpose to attempt to analyze or classify the numerous cases on the subject. Many cases are reviewed in the annotations in 2 A. L. R. and 113 A. L. R., above referred to; and a very extensive list of cases is found in the annotation to State v. Corbitt (1921), 117 S. C. 356, 109 S. E. 133, 20 A. L. R. 328. The circumstances vary in the cases, as where the killing results from a series of shots or from one act.

While the California case above cited (People v. Brannon, supra) notes Iowa as being one of the states which holds that there is but one offense, we do not think that that classification is entirely justified. The case of State v. Wheelock (1933), 216 Iowa 1428, 250 N. W. 617, is cited as authority for such a conclusion. This case, in an opinion by Justice Evans, reviews carefully the authorities on both sides of the proposition. The defendant, by separate indictments, was accused of the killing of three persons in an automobile collision, for one of which he was tried and acquitted and was afterwards sought to be tried on another of the indictments. In the second case a plea of former acquittal was interposed and sustained, and an appeal taken by the State, which contended that the killing of three persons necessarily resulted in three separate offenses; the defendant, on the other hand, maintaining that the cause was barred by the acquittal in the first case. The Iowa cases involving like or similar questions are thoroughly reviewed, with cases from other jurisdictions, both for and against the defendant's proposition. The opinion holds that the Iowa case most nearly in point is State v. Sampson (1912), 157 Iowa 257, 138 N. W. 473, 42 L. R. A., N. S., 967. We need not again review the cases cited, both by the defendant and by the State, and analyzed in the Wheelock opinion; but the holding of the court was that since there was but one act and the crime charged was involuntary manslaughter, to again try the defendant after acquittal on the first indictment would be double jeopardy and that the second prosecution was barred by the verdict in the first. But it will be noted that the court very carefully hedges

in the opinion and confines it strictly to circumstances such as in the decided case, and states at page 1448 of 216 Iowa, page 625 of 250 N. W.: "Except as to cases of involuntary manslaughter, it is not the purpose, or the purport, of this opinion, to establish any new precedent or to extend or restrict what has already been said in our own cases. Our opinion herein shall go no farther than to determine whether an involuntary manslaughter of two or more persons attributable to the single negligence of the defendant, without any intent on his part to cause any injury, is a single or a multiple offense." It will thus be seen that this case is not a precedent except for such an offense as the slaying of more than one person by one act, and the court very carefully confines it to that particular situation. There is authority holding that, even under such circumstances, the killing of each person constitutes a single offense. But the Wheelock case we think is not authority under facts such as in the case at bar. Here, as to one person, there was justifiable self-defense; the other killing was the result of an accident, according to defendant's own theory. The deaths of the two were not the result of a single act, but a series of acts. We do not want to go so far as to hold that acquittal for the death attributable to one act can be considered a bar to a subsequent prosecution for a crime arising out of another act, no matter how closely the two acts may be related in time; nor to extend the doctrine of the Wheelock case beyond the situation to which it is expressly limited by the opinion itself. Under our authorities we cannot adopt the doctrine of the Spannell case, supra, but prefer to hold with those cases which treat the different acts as separate crimes. Cases involving two deaths arising from the single discharge of a gun or the negligent driving of an automobile upon the highway are not authority, under the holding of the Wheelock case, for a plea of double jeopardy where there are distinct and separate acts.

II. Complaint is made that nowhere in the instructions were the jury told that the burden is upon the State to show that the act in question was not committed in self-defense or by accident. The jury were told in instruction No. 10, relating to murder in the second degree, that they were required to find beyond a reasonable doubt, among other things, that

such killing was not justifiable or excusable—that is, not done in self-defense or by accident, nor done under sufficient provocation to reduce the offense to manslaughter—and that if they so found, they should return a verdict of guilty of murder in the second degree. But they were not told that in manslaughter the burden was upon the State to negative self-defense or accident. It is true that in the definition of manslaughter the jury were told what manslaughter consists of, but there was no instruction telling the jury what they must find in order to convict of manslaughter. The jury should have been instructed that the burden was upon the State to establish not only the crime charged, or for which defendant was on trial, but all included crimes—that is, that the burden in manslaughter was equally great to establish beyond a reasonable doubt that the killing was not the result of accident.

The court submitted to the jury in various instructions the question of self-defense of the defendant as against Joe Melia. The former trial was a part of the record of the court. It so appears in the instructions in this case, and in instruction No. 12, as well as in instruction No. 10, the question of self-defense was submitted to the jury. In instruction No. 12 the jury were told that a plea of self-defense and the evidence relating thereto should be carefully scrutinized and considered, to the end that if the accused was acting in self-defense at the time of the shooting of Josephine Melia, he should not be found guilty; but "if he was not acting in self defense, then due regard for the ends of justice and the welfare of society demands that persons guilty of crime may not make use of that plea as a means of defeating justice and to protect them from criminal responsibility for a violation of the laws of the State." Instructions Nos. 14, 15, 16, and 17, all submitted to the jury the question of determining whether the defendant was acting in self-defense against Joe Melia —as, for instance, in instruction No. 14, if the jury found that Joe Melia was the aggressor and that Matt M. Melia had been assaulted by him and had reason, as an ordinarily reasonable and cautious man, to believe, and did in good faith believe, that he was in imminent danger of death or great

bodily injury, "the defendant Matt M. Melia was justified in the use of such means to protect himself from death or great bodily harm as may in good faith have appeared necessary to him acting as an ordinarily cautious and prudent man under all the circumstances, even to the taking of human life." And the contrary is also stated in the instruction. It will be noticed that this leaves to the jury the question of determining again whether Matt M. Melia was acting in self-defense as against Joe Melia.

Instruction No. 15 submits to the jury, on the question of accident, the determination whether Matt M. Melia was justified in shooting at Joe Melia. In instruction No. 16 the jury were admonished that: "The defendant is now on trial under the indictment returned in this case only, charging him with the murder of Josephine Melia," and that evidence relating to Joe Melia showed a separate and distinct transaction, and that the guilt or innocence of the defendant so far as the death of Joe Melia is concerned must not be considered by the jury except as the facts developed by the proof show, or tend to show, defendant's guilt or innocence of the crime charged in the case. This, at the least, is inconsistent with the two preceding instructions in which the jury were told to consider whether or not Matt M. Melia was justified in the shooting of his brother. Further in the same instruction the jury were told: "And the fact that he has been heretofore tried should have no bearing whatever upon your verdict in this case." Instruction No. 17 again submits to the jury the question of Joe Melia's character and disposition, in order that the jury might determine whether or not Joe was the aggressor, and also as to whether the defendant used greater force than was necessary. There was also some reference made to threats, as they might bear upon the state of mind of the defendant, and as to whether or not the defendant acted in what appeared to him to be a reasonable apprehension of death or great bodily injury at the hands of Joe Melia.

Now, all of these instructions, of which only a portion is given, leave with the jury the question of determining

the question of justification, or lack of justification, in the killing of Joe Melia. But in the preceding case, where the defendant was on trial for the murder of his brother, the jury returned a verdict of not guilty—that is, they found that the defendant was justified in the killing. So far as that shooting is concerned, the defendant has been exonerated. Is it proper, then, that there should be submitted to another jury that same question, which has already been determined? We believe that this no longer remained an open question, but that the defendant was entitled to have the jury told that, as to the killing of Joe Melia he had been acquitted, and that, so far as Joe was concerned, there remained for the jury no question as to defendant's exoneration.

We do not think that the record in this case justifies the submission of self-defense. The defendant did not claim in his testimony that there was any occasion for the exercise of lawful self-defense against Josephine. The only ground upon which he could have been convicted of manslaughter as to her would be the reckless or careless use of the gun. True, it was the duty of the State to negative the claim that the killing of Josephine was by accidental means; but under the state of the record as it now is before us, we see nothing to justify the submission to the jury of the question of self-defense as to Joe or as to Josephine. In this we think the court was in error, and was also in error in not specifically informing the jury as to the burden of proof as to accident.

Some cases where the question has arisen indicate that there is some doubt as to whether or not the plea of former jeopardy should be submitted to the jury or determined by the court. However, in the case at bar, where all the facts regarding the former trial were of record and well known, it would have been a useless matter to submit to the jury the question of prior adjudication; but the court was right in refusing to consider it as a bar and there was no occasion for the determination of the question as a matter of fact.

Numerous other assignments of error are made, but most of them are based on the claim of double jeopardy already referred to, and it is unnecessary to discuss others, as we have

already pointed out the principal objections made by the defendant.

For the reasons heretofore given, the cause must be reversed.—Reversed.

CHIEF JUSTICE and all JUSTICES concur.