STATE OF IOWA, appellee, v. H. H. THOMPSON, appellant.

No. 47293.

(Reported in 39 N.W. 2d 637)

18

November 15, 1949.

Hansen & Wheatcraft, of Des Moines, for appellant.

Robert L. Larson, Attorney General, Don Hise, First Assistant Attorney General, and Carroll O. Switzer, County Attorney, for appellee.

HAYS, C.J.—In 1947, the grand jury of Polk County, Iowa, returned an indictment which accused William H. Cotton, Charles E. Parmenter, Roy J. Hild, Ben B. Dewey and H. H. Thompson of conspiracy as defined by section 719.1, Code of 1946, and charged that the said named parties unlawfully conspired with each other and with other persons unknown to the grand jury with fraudulent and malicious intent and purpose to commit a felony by obtaining money from Polk County by means of false pretenses and with intent to defraud. H. H. Thompson, being granted a separate trial, was found guilty by a jury and he appeals.

All of appellant's codefendants were members of the Board of Supervisors of Polk County and appellant was the director of Social Welfare and Overseer of the Poor for said county. The conspiracy charge is based upon numerous claims filed by one Elmer G. Croft for alleged service and parts furnished by Croft to Polk County for cars operated by appellant's department, and which claims were approved for payment by the county by this appellant. The manner in which these claims were approved will be discussed later herein.

In 1946, an indictment was returned by the grand jury of Polk County which accused Elmer G. Croft, H. H. Thompson (appellant herein) and William H. Cotton of obtaining money by false pretenses, as defined by section 713.1, Code of 1946, and charged that said parties obtained from Polk County the sum of $1285.20 by means of false pretenses. In a separate trial H. H. Thompson, though indicted and tried as a principal, as provided for by section 688.1, was found not guilty by a jury, the case being submitted upon the theory that Thompson aided and abetted Croft in the commission thereof. The claim upon which this indictment was based had been approved by Thompson in the same manner as were the claims used in the instant case.

Upon the trial of the first indictment, many of the claims used in the instant case were offered and received in evidence and the jury was instructed that if certain facts were found to be established in connection therewith, they might be considered as bearing upon the defendant's knowledge and intent in making the alleged misrepresentation as to the specific claim upon which the indictment was predicated. The jury was also told that even

though they found these other claims to be false, that the defendant knew them to be false and fraudulently represented them for payment with intent to defraud, still defendant could not be convicted unless they found such was the case as to the specific claim in question.

Appellant, upon arraignment in the instant case, entered a plea called "answer and plea of res judicata." Upon motion by the State this plea was stricken from the record, and which ruling constitutes one of the assigned errors.

During the trial herein, and at the close thereof, objection was made to a motion to withdraw from the record the various claims which had been considered by the jury in the first trial. This was under the theory of res judicata. The trial court overruled the same and this is assigned as error.

At the close of all of the testimony appellant moved for a directed verdict, one of the grounds being the claim of res judicata. This motion was overruled and this ruling is assigned as error.

The above three assignments of error will be considered together upon the question of res judicata.

██ The law is well-settled that the defense of res judicata is recognized as being applicable to criminal as well as civil cases. Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180; 30 Am. Jur., Judgments, section 178; 147 A.L.R. 991; State v. Melia, 231 Iowa 332, 1 N.W. 2d 230; Restatement of the Law, Judgments, page 159. This defense is, however, vastly different than a plea of "former jeopardy." In the former jeopardy plea, the second prosecution must be for the same act and crime, both in law and in fact, as was the first prosecution. 15 Am. Jur., Criminal Law, section 359; State v. Folger, 204 Iowa 1296, 210 N.W. 580; State v. Cowman, 239 Iowa 56, 29 N.W. 2d 238. In a defense of res judicata the same may go to the entire charge or may be asserted only as to a portion of the evidence to be offered on the second trial. Restatement of the Law, Judgments, section 68; 50 C.J.S., Judgments, section 754(a); 147 A.L.R. 196, 197.

██ I. In this state all criminal procedure is statutory. Section 777.11, Code of 1946, designates the pleas that may be entered to an indictment. Division (3) thereof says "of a former judgment of conviction or acquittal of the offense charged."

This has always been held as meaning "former jeopardy." The law is well-settled that a plea of former jeopardy will not be considered where the same transaction may be the basis for the second prosecution, as was the first, where the transaction represents two distinct offenses. Especially is this true where the two offenses are made so by statute. See sections 719.1 and 713.1, Code of 1946. The law is also well-settled, although there is some authority to the contrary, that a conviction or acquittal for a substantive offense will not sustain a plea of former jeopardy upon a trial for conspiracy to commit the act. 15 C.J.S., Conspiracy, section 47(a); 112 A.L.R. 983; State v. Brown, 95 Iowa 381, 64 N.W. 277; State v. Blackledge, 216 Iowa 199, 243 N.W. 534. Thus, while in a plea substance rather than form is to govern (State v. Callendine, 8 (Clarke) Iowa 288), it is apparent that the former acquittal of appellant does not sustain a plea of former jeopardy, and the plea of res judicata not being recognized by section 777.11, Code of 1946, there was no error in striking the plea. State v. Caywood, 96 Iowa 367, 65 N.W. 385.

II. Appellant asserts that he is entitled to a directed verdict under the theory of res judicata irrespective of the ruling upon the motion to strike the plea, and relies upon the recent case of Sealfon v. United States, 332 U.S. 575, 580, 68 S.Ct. 237, 240, 92 L.Ed. 180. In that case the defendant had been tried upon the theory of aiding and abetting, and acquitted on the charge of conspiracy to defraud the United States, based upon a letter written by defendant and alleged to be false and written with intent to defraud. He was then indicted and tried for the substantive offense of uttering false invoices, based upon the identical letter. The United States Supreme Court in reversing a conviction thereon said:

"The basic facts in each trial were identical. As we read the records of the two trials, petitioner could be convicted of either offense only on proof that he wrote the letter pursuant to an agreement with Greenberg. Under the evidence introduced, petitioner could have aided and abetted * * * in no other way. * * * It was a second attempt to prove the agreement which at each trial was crucial to the prosecution's case and which *was necessarily adjudicated* in the former trial to be non-existent." (Italic added.)

Sound as that decision may be, upon the facts therein, it is of no assistance to appellant. While the act committed by him, which was the basis for the charge in the former case, is of the *identical type* as was committed by him in the instant case, it was a separate and distinct act from the ones relied upon in the present case. The determination in the first case that the act was not fraudulent goes no further than that specific act. It was not "the core of the prosecutor's case in each case", as was the situation in the Sealfon case. The defense of res judicata not being available to appellant as a defense to the entire charge, he was not entitled to a directed verdict upon this basis. The ruling of the trial court was correct.

III. Also under the res judicata theory it is claimed by the appellant that it was error to submit to the jury, in the instant case, the same claims that had been considered by the jury in the former trial. As before stated, these claims were submitted solely as they might bear upon the knowledge and intent of the defendant in the doing of the specific act charged. These claims did not present or raise any ultimate facts to be decided by the jury in that case but were merely evidentiary facts from which the ultimate fact *might* be determined. The law is well-settled that the theory of res judicata is confined to ultimate facts and does not extend to evidentiary ones. Restatement of the Law, Judgments, section 68; 142 A.L.R. 1243; The Evergreens v. Nunan, 2 Cir., N. Y., 141 F. 2d 927, 152 A.L.R. 1187, and annotation. The various claims were properly permitted in the record.

IV. Appellant further contends that there should have been a directed verdict because of the insufficiency of the evidence tending to connect him with the alleged crime—in short, insufficient corroboration of the accomplice, Croft.

The crime charged is conspiracy, which is a combination or agreement between two or more persons to do or accomplish a criminal or unlawful act, or to do a lawful act by criminal or unlawful means. State v. Schenk, 236 Iowa 178, 18 N.W. 2d 169. We are here concerned with a criminal or unlawful act. The gist of the crime of conspiracy is the unlawful agreement or combination and does not depend upon the fulfillment of the act. State v. Clemenson, 123 Iowa 524, 99 N.W. 139; State v. Savoye, 48

Iowa 562. It may be established by either direct or circumstantial evidence. State v. Carlson, 203 Iowa 90, 212 N.W. 312.

The State's case is based upon the testimony of Elmer G. Croft and a series of transactions wherein many false claims, filed against Polk County by Croft, were approved by appellant and paid by Polk County. The law is too well-settled to require the citation of authorities that before one may be convicted upon the testimony of an accomplice there must be produced independent testimony connecting the defendant with the commission of the crime, and it is not enough that it may show a crime has been committed and the details thereof. But see section 782.5, Code of 1946; State v. Hild, 240 Iowa 1119, 39 N.W. 2d 139; State v. Davis, 230 Iowa 309, 297 N.W. 274. That Croft is an accomplice cannot be denied, and the trial court so instructed the jury. It cannot well be denied under this record that Polk County was defrauded of many thousands of dollars on account of the false claims filed by Croft.

In order to sustain the conviction in this case it is not necessary that any specific overt act be alleged or proved by the State. Neither is it necessary that there be direct testimony as to appellant's participation therein, as such may be established by circumstantial evidence, and this may be sufficient whether used as the basis of proving the crime and defendant's doing thereof, or used for the purpose of corroborating an accomplice. State v. Reno, 67 Iowa 587, 25 N.W. 818; State v. Patten, 191 Iowa 639, 182 N.W. 788; State v. Stader, 194 Iowa 1087, 190 N.W. 373.

There is no direct testimony tending to show any agreement or combination to defraud Polk County, to which appellant was a party, except as the same may be gathered from the testimony of Croft. For the purpose of corroborating their witness Croft, the State produces numerous witnesses who testify to incidents and circumstances attending appellant's conduct of his office and the many claims approved by him. Do they all, when considered together, supply that quantum of proof required to justify the submission thereof to the jury?

For many years Croft had operated a garage under the trade name of "Modern Motor Service", and under this name dealt with Polk County. Hereafter we will merely refer to Croft. For

many years he had been furnishing storage, repairs and service for the cars owned and operated by the county, including those used in appellant's department. He was given a free rein and, as stated by him, they (the Board of Supervisors) said "you take care of them [county cars] and whatever you do is O.K. with us." It is clear that appellant had nothing to do with this arrangement.

The State offered in evidence Exhibits 1 to 119, inclusive, which are claims and corresponding warrants. They are for items alleged to have been furnished for the maintenance of the six cars and truck operated by appellant's department. They were all filed by Croft, Nos. 1 to 96 being under the name of Modern Motor Service and Nos. 97 to 119 being under the name of McGrath Motor and Body Service, which was another trade name adopted by Croft.

Croft, as a witness, identified each claim and stated whether it was true or false in whole or in part. Nothing would be gained by attempting to set forth herein in detail these various claims. In 1945, they totaled about $17,500, of which $11,500 is alleged to be false. In 1946, the total amount was about $12,583, of which $8,500 was false.

The indictment charges conspiracy between Cotton, Dewey, Hild, Parmenter and Thompson and with parties unknown; this unknown party must have been Croft himself. Croft, as a witness, states that when he filed these claims Mr. Cotton knew that they were false, as they had discussed the matter many times. He states that Mr. Dewey knew about it and that Dewey insisted that Mr. Hild be taken care of, as Hild had only the Juvenile Home and had no other way of getting it. He states that Mr. Hild was fully informed of the scheme and received many benefits therefrom. In reference to appellant's knowledge and participation in the affair the most of his statements are of a different nature.

Exhibit 9 contained an item for gasoline in the amount of $31.50 which Croft states went into the private cars of the supervisors. He states that Mr. Thompson did not know that it was being thus delivered and charged to his department.

During the 1946 campaign Mr. Hild was a candidate for re-election. Cars were rented by Croft and used in his campaign, the cost of which was recovered by false claims filed in appellant's

department. Croft states that Mr. Thompson knew nothing about this until after the election.

Exhibit 11 is a claim for tires, amounting to $770.04. Croft states, concerning this claim: "I billed the county * * * and it got nothing, but Hild had to be taken care, Cotton had to be taken care of and Parmenter had quite an arm in this deal."

Exhibit 22 is for $873.13, and of this amount $678.21 was false. Croft testified that no one asked him if the items had been delivered but that Mr. Cotton knew they had not; that "this man here [Thompson] didn't know nothing about it. He wasn't supposed to know."

Exhibit 36 was for tires in the amount of $1053.15, all of which was false. Croft testifies: "Thompson was always asking whether we needed all that stuff on new cars and he was always on Cotton about it," also that he would ask him (Croft) and "I would tell him to call Cotton." As to this specific claim, "Thompson came to the garage and says, 'where are all of these tires?' I said in the warehouse and he then asked me if we really had the tires, and I said, yes."

Thompson made inquiry about many items as to whether they were furnished for the cars, according to Croft. Croft relates one conversation as follows: " 'Elmer', he says, 'how come the cars need so much of these things?' and he says, 'what are these things?' I said, You wouldn't know any more after I got through telling you than you know now, so forget it. I told that to Mr. Thompson a number of times because I knew he was ignorant of it."

In relating a conversation between Cotton and himself, Croft stated that Cotton said, " 'Well, so long as Thompson is up there and he doesn't know anything about what it takes'—I said, Thompson is kicking and you know he is, he kicked on this bill and I said, How long do you intend to make a fool out of that man?"

Croft testified, after considerable questioning and arguing with the court and counsel, that he paid Thompson $200 in January 1946. At this time, he was removed from the courtroom. He appeared again as a witness the next day, but no questions were asked relative to payments to Thompson. That was on Sat-

urday. On Monday, he was again a witness and testified that he paid Thompson $200 per month during each month in 1946.

The foregoing states, in substance, all the references that are made by Croft concerning appellant's knowledge or participation in the fraud. In addition to the above, the record shows that during the years 1945 and 1946, Croft would place parcels of meat in Thompson's car. Relative to this, Mr. Hill, a mechanic working for Croft, testified that Croft did this with a great many of his good customers, naming several prominent business and professional men in Des Moines as being some of them. The record also shows that during 1945 and 1946, appellant had a stable near Des Moines where he kept some saddle horses; that Croft gave appellant $200 to purchase a horse for him, but that it was returned when a satisfactory animal was not found. Later a horse was purchased for $75 and was kept at appellant's stable. Croft would come to the stable and ride this horse and would bring friends who would use appellant's horses. Some hay and grain were sent to the stable by Croft, and paid for by him. Croft says appellant wanted to pay for it, but that he would not take it.

In addition to the above, there remains the testimony as to the various claims and the manner in which they were approved by appellant. There is but little dispute in the record as to this phase of the case. Croft would make out a statement against the county for items alleged to have been furnished for the Welfare Department cars. This he would present to L. J. Huss, an auditor in that department. Huss would check the items and the charges. He then had them copied onto a requisition form that was used in the department, and would then attach to the claim and requisition a "bill back", which was a verification by Croft that the claim was just and correct. On the face of the requisition, which was directed to the County Purchasing Committee, the following was typed under the items listed: "Requested by ................; approved by ................." On the back of the bill back Huss placed a stamp which stated: "Audited by ................; submitted for approval by ................; ................." Huss would sign his name in this stamp where it said "Audited by ................" The papers then went to the chief clerk, George F. Greenlee, who would sign on the face of the requisition where it said "Requested

by ................." and also on the stamp on the bill back where it said "Submitted for approval by ................." The papers then went to appellant's desk and he would sign on the requisition where it said "Approved by ................." and on the bill back where it said "Submitted for approval................."

The papers thus approved were then given or sent to Croft. He would then procure the signature of three members of the Board of Supervisors to the effect that they had audited the claim and recommended payment. The claim would be presented to the county auditor, who would issue a warrant in payment. The claim would be formally allowed by the Board at its next meeting. This was the custom that had been in effect for many years.

Prior to Mr. Cotton's becoming chairman of the Board, in 1945, and likewise chairman of the Welfare Department, many items were furnished to the county when needed, without formal requisition, and paid for when the claim had been approved by the department head and three members of the Board. This was true of claims for car repairs, service, etc., for the county cars. When Mr. Cotton became chairman he required that all claims in the Welfare Department, whether for items already ordered or furnished or to be ordered, should have a requisition attached. It is stated by appellant, and not denied in the record, that it was customary on requisitions for articles that were already ordered or furnished to write thereon the word "received". This word appeared on most of the claims involved herein. This was done to indicate to the Board that no order was necessary. In no instance does there appear the signature, under this word "received", of anyone connected with the department. The testimony of the State examiners on this point is that to them the word "received" indicates that the articles had been actually received, although they concede that there is no mark or signature to show that a check had been made as to that fact.

Mr. Denman, a Des Moines businessman, was called as witness for the State. He testified that during the time the many bills for tires were being presented to the department, appellant came to him and complained about the number that were being purchased through his department. He also states that he told appellant that many firms were buying all the scarce materials

they could and that he should not worry about it, but do as he was told by the chairman of the committee.

The county auditor and the treasurer both identified the exhibits and testified to the custom that had been in effect for years as to the payment of claims. The auditor stated that he relied upon the signature of the three members of the Board of Supervisors appearing upon the bill back. The State examiners related in detail the number of duplicated claims or items that were filed and the excessive number of claims filed for tires, tubes, brake linings, gasoline, etc. They stated that at no time did they discuss this matter with appellant.

While Croft testified to having paid sums of money to the appellant, there is not one word of other testimony tending in any way to substantiate this statement. There is, throughout the testimony of Croft, the inference, and frequently the direct statement, that Thompson knew nothing about it. The only thing in the entire record that can be taken as any indication that an agreement existed between appellant and any of the others to defraud the county is the fact that he did approve the claims—many of them false—and, if taken together, palpably so. The act of approving these claims which were filed in his department was an official duty falling upon appellant, as director. The duties of the office were heavy and the purchases numerous. He was the administrative head of the department as well as having the supervision of the one hundred two employees in the department. The record shows that in all cases where he approved a claim it had passed over the desks of the auditor and the chief clerk, and they had each approved. Each claim, when it reached his desk, had an affidavit by the claimant to the effect that the items had been furnished and that the claim was correct. Perhaps he was careless; perhaps he should have personally checked each item and made sure that it was actually furnished, but under this record we do not find sufficient facts tending to connect appellant with the fraud to warrant submitting the same to the jury for speculation. The motion should have been sustained.

V. Appellant also asserts as an error certain remarks made by Mr. Thayer, State's attorney, in his opening statement to the jury. It is true that in that statement there were statements made as to what the State would prove, which a reading

of the record shows was not proven, and some of them are of the nature that might lead us to believe that it was known they could not be proved. However, in every case that is tried, there are usually found statements by counsel as to what they expect to prove but later find that they are unable to do so. While it is not, in all cases, necessary to interpose objections, yet none was entered here and we are not prepared to say that such statements show deliberate bad faith on the part of counsel, such as to constitute reversible error.

VI. Finally, it is claimed by appellant that a new trial should have been granted, based upon the recantation of the witness Croft. After the verdict, but before the motion for a new trial was filed, Croft made an affidavit in which he repudiated the testimony made at the trial as to payments made to appellant. He also went into great length in explaining his conduct as a witness, and the reasons for his false swearing. Counter-affidavits were filed in resistance thereto. Nothing will be gained by setting forth at length this series of statements and denials. The record is clear that Croft committed perjury, either at the trial or in the affidavit. He was a twice-convicted felon, one of the convictions being for the fraud involved in this action. This recantation is included in the motion for a new trial as newly discovered evidence. While the statute does not include newly discovered evidence as a basis for a new trial (section 787.3, Code of 1946), we have held that anything that shows that the defendant did not receive a fair trial is sufficient. State v. Burgess, 237 Iowa 162, 21 N.W. 2d 309.

While the authorities are not in accord on this question, the majority rule appears to be that ordinarily recantation by a witness is not an absolute ground for a new trial; that there is considerable discretion lodged in the trial court. 39 Am. Jur., New Trial, section 169, page 175; 33 A.L.R. 550; 158 A.L.R. 1062. Each case must, of necessity, depend upon its own peculiar facts. The question which is raised by a recantation goes to the credibility of the witness, and is a jury question, ordinarily. We are not prepared to say that the trial court abused its discretion here, especially in view of the fact that the question is really moot in view of our holding under Division IV hereof.

For the reasons set forth in Division IV hereof this cause must be reversed.—Reversed.

All JUSTICES concur.