STATE OF IOWA, appellee, v. WAYNE KEYSER, appellant.

No. 51371.

(Reported in 130 N.W.2d 701)

74

OCTOBER 20, 1964.

REHEARING DENIED DECEMBER 15, 1964.

Julius L. Sherwin, of Chicago, Illinois, and Norman William Seemann, of Waterloo, for appellant.

Evan L. Hultman, Attorney General, and John H. Allen, Assistant Attorney General, for appellee.

LARSON, J.—On March 7, 1963, defendant was indicted for the crime of conspiracy in violation of section 719.1, Code, 1962. Pursuant to his plea of not guilty, trial was had October 14, 1963, and the jury returned two verdicts finding him guilty as charged in Counts I and II. Judgment was entered January 17, 1964, and he was sentenced to a term of not to exceed three years imprisonment in the State Penitentiary at Fort Madison, Iowa,

on each count, the sentences to run concurrently. Defendant appealed.

The indictment originally contained three counts. Count I charged, in substance, a conspiracy between Keyser and Coffman to defraud Alter Company. Count II charged a conspiracy to defraud Deere & Company and Count III charged a conspiracy to break and enter the Waterloo Railroad Company Scale Building. Count I further alleged that the conspiracy there alleged was committed in the same transaction as the conspiracies alleged in Counts II and III. Count II further alleged that the conspiracy there alleged was committed in the same transaction as the conspiracies alleged in Counts I and III. Count III further alleged that the conspiracy there alleged was committed in the same transaction as the conspiracies alleged in Counts I and II. Count III was not submitted to the jury.

For the sake of brevity the abbreviations utilized by counsel will be used herein: Alter Company as Alter, Deere & Company as Deere, Waterloo Railroad Company as Waterloo, James Coffman as Coffman, and the defendant Wayne Keyser as Keyser.

Throughout the trial defendant made numerous objections to the evidence. His argument follows three assignments—his objection to evidence of the shortage in the Deere scrap metal pile, especially as it related to 41 cars of scrap he sold to Alter between May and October 1962; his objection to testimony relating to the last seven cars involved, for the reason that three cars were not sold to Alter or Deere and four were never actually consigned or sold to anyone; and his objection to a hypothetical question put to the State's scale expert. However, his principal contention appears to be that there was insufficient competent evidence of a conspiracy to support a jury verdict as to him.

Motions for directed verdict as to Counts I and II made at the close of the State's case, and again at the close of all evidence, were denied and error is predicated thereon.

■ I. In considering the sufficiency of the evidence it is necessary to refer only to that which tends to support the verdict. State v. Poffenbarger, 247 Iowa 552, 554, 74 N.W.2d 585, 586, and citations; State v. Olson, 249 Iowa 536, 558, 86 N.W.2d 214. Of course this evidence must be viewed in a light most

favorable to the State. State v. Harless, 249 Iowa 530, 531, 86 N.W.2d 210, 211; State v. Poffenbarger, supra.

The following is a summary of the evidence the State claims does tend to support the jury verdict.

During the period involved herein, from May to November 15, 1962, Keyser was a dealer in scrap iron and steel operating in the Waterloo vicinity. Alter is a broker acting in behalf of its customers, including Deere, a user of scrap. Deere would issue a purchase order to Alter for a certain number of carloads of scrap and Alter would contact dealers such as Keyser and get commitments from them sufficient to fill the order from Deere. During the period from May until October 1962 Keyser furnished 41 cars of scrap for Deere pursuant to orders from Alter. When Alter received the bills of lading and certified weight tickets from the Waterloo Railroad on delivered cars of scrap, it would advance 75 percent of the value of same to the dealer, and the balance would be paid usually within thirty days when Alter was paid by the user, Deere, in the case of these 41 cars. There was testimony that agreements between Alter and the dealers, including Keyser, for the purchase of scrap to fill orders for users such as Deere, were generally made verbally and were followed up with paper work.

On November 13, 1962, Charles Smith, vice-president of Alter, called Keyser by telephone to inquire about three cars of scrap he understood were being loaded in the Waterloo yard. Keyser told Smith those three cars were not for Alter's account, but that four other cars being loaded were. Those car numbers were D.R.G.W. 55207, P.R.R. 347458, P.L.E. 40992, and P.R.R. 374685. Upon this commitment Smith noticed these cars to Deere. They were applied against an open purchase contract with Keyser which showed shipment to Deere. It also appeared the three cars Keyser said were not for Alter's account were C.B.&Q. 82287, D.R.G.W. 55207 and P.R.R. 612797.

Frank Krieg, purchasing agent of Deere during 1962, testified it was Deere's policy to build up its scrap reserve during the months of August, September and October, but when it appeared that stock was not increasing in spite of its added pur-

chases, an investigation of the estimated shortage was undertaken by Deere in November 1962.

Keyser used the weighing facilities of Waterloo during the period from May to November, was present most of the time weighing was done, and would direct to whom the cars of scrap were to be billed through the Waterloo freight office. In each past instance the consignee was Deere. On November 7, 1962, he had three cars of scrap weighed at the Waterloo yards and was present in the scale house with the weighmaster when they were weighed. They were the three Keyser told Smith were not for the Alter account, but originally the three bills of lading were made out at the Waterloo freight office by Coffman, an employee of Keyser, consigning these cars to Deere from Alter. The gross weight of each car, which is the sum of the light weight and net weight, was 200,400 pounds for D.R.G.W. 55207, 203,-100 pounds for C.B.&Q. 82287, and 192,700 pounds for P.R.R. 612797. The following week Keyser changed the name of the shipper on these bills from Alter to West End Iron & Metal.

Pursuant to the Deere investigation of its scrap shortage, the same three cars were reweighed at the Borden plant adjacent to Deere's yards. The gross weights at that time were 114,300 pounds for D.R.G.W. 55207, 120,900 pounds for C.B.&Q. 82287, and 108,100 pounds for P.R.R. 612797, a difference of some 84,000 pounds per car. A conference resulted between police officials and a special agent, Darrell Pepperling of the Illinois Central Railroad, and when the four empty gondola cars were placed at Keyser's disposal in the Waterloo yard to be loaded they were kept under surveillance. On November 12, 1962, Keyser's trucks arrived and his men commenced loading the cars with scrap iron.

At approximately 5:30 a.m. on November 15, 1962, Keyser asked to have his cars of scrap weighed and shortly thereafter the weighmaster began weighing them. The weighmaster Ray DeBerg testified he "asked Mr. Keyser there if these cars were going to Deeres, he said they was." After weighing them they were lined up with a "drag" going to Deeres. The gross weights of the four cars recorded at that time were 207,300 pounds for P.L.E. 40992; 196,400 pounds for P.R.R. 347458; 188,000

pounds for P.R.R. 374685; and 188,600 pounds for D.R.G.W. 55207. These were the four cars Smith said Keyser told him would be consigned to Deere for Alter's account.

At about 6:15 of the same morning Special Agent Pepperling, Captain Beener and Patrolman Henry of the Waterloo Police arrived at the Waterloo yards. After the four cars had been weighed, Captain Beener had a short talk with trainmaster Bingham at the scale house and then motioned for Henry and Pepperling to join them. Pepperling entered the scale house, removed the iron grate covering the entrance to the pit housing the scale mechanism, and went down into the pit. He testified he shined his flashlight around the pit and saw a man wedged up between the rafters. The man came down at his order and the officer followed him up the ladder and out of the pit. He was then taken into custody by the Waterloo officers, and Bingham ordered the four cars of scrap to be reweighed.

The intruder told Captain Beener his name was James Coffman and said he was a truck driver for Wayne Keyser, who had remained in the vicinity during these events. Captain Beener testified Keyser asked if he could speak to Coffman alone, that he refused but said they could talk in his presence. That offer was not accepted. Keyser admitted Coffman was his driver and testified he said to Coffman, "Just tell your name and address and nothing else." The other officers present testified Keyser advised Coffman several times to give only his name and address to the police and "everything will be all right." Coffman had worked for Keyser in Waterloo from August 1962 and had worked for him off and on at other places.

When the four cars were reweighed it was found car P.L.E. 40992 weighed 127,500 pounds, car P.R.R. 347458 weighed 116,700 pounds, car P.R.R. 374685 weighed 108,000 pounds, and car D.R.G.W. 55207 weighed 107,600 pounds—a difference of some 79,000 pounds per car.

Coffman's weight was estimated at approximately 150 pounds, and a scale expert Kevin L. Baker, in response to a hypothetical question, testified that a 150-pound weight placed approximately 18 inches from the end of the traverse lever in

the scale pit would add approximately 78,000 pounds to the total weight of a railroad car.

Coffman was unavailable as a witness, but Keyser admitted on cross-examination that only he would stand to profit by the manipulation of the traverse bar of the scale.

 II. The crime of conspiracy is a combination or agreement between two or more persons to do or accomplish a criminal or unlawful act, or to do a lawful act by criminal or unlawful means. State v. Thompson, 241 Iowa 16, 22, 39 N.W.2d 637; State v. Schenk, 236 Iowa 178, 18 N.W.2d 169. We are concerned here with a criminal or unlawful act, the gist of the crime being the unlawful agreement or combination with intent to defraud. It does not depend upon the fulfillment of the act. State v. Thompson, supra; State v. Clemenson, 123 Iowa 524, 99. N.W. 139; State v. Savoye, 48 Iowa 562. It may be established by either direct or circumstantial evidence. State v. Carlson, 203 Iowa 90, 212 N.W. 312. If by circumstantial evidence, the testimony must create more than suspicion of guilt. "There must be substantive proof of guilt—some fact proven which tends to establish the substantive facts upon which the State relies for conviction. * * * and where facts and circumstances are relied upon to prove guilt, they, when established, must negative every other rational hypothesis except the guilt of the defendant, and must be inconsistent with any rational hypothesis of innocence." State v. Vandewater, 176 N.W. 883, 884 (not published in Iowa Reports); State v. Myers, 253 Iowa 271, 275, 111 N.W.2d 660, 663.

 Admittedly, there is no direct evidence of the alleged conspiracy, but there is much circumstantial evidence and testimony of a substantive nature which points to its existence. Many substantive facts were established that are entirely inconsistent with a rational hypothesis of innocence. Of course, from the nature of the charge a conspiracy may, and frequently must, be proven in this manner. State v. Olson, supra, 249 Iowa 536, 558, 86 N.W.2d 214, and citations. As previously stated, in considering the sufficiency of the evidence we need only to refer to that which tends to support the verdict. The evidence is substantial which tends to connect Keyser with Coffman and to show a con-

cert of action designed to defraud both the broker Alter and the consumer Deere by weight manipulations. It raises a fair inference of guilt and does more than generate suspicion, speculation or conjecture. It is far stronger than the circumstantial evidence produced in State v. Thompson, supra, 241 Iowa 16, 39 N.W.2d 637, and State v. Myers, supra, 253 Iowa 271, 111 N.W.2d 660, relied upon by appellant. It is, we think, stronger than that disclosed in State v. Poffenbarger, supra, 247 Iowa 552, 74 N.W.2d 585, and State v. Olson, supra, relied upon by the State.

True, we would not permit a verdict of guilty to stand where there is an absence of proof of any of the essential elements of the crime charged, for a conviction notwithstanding such absence of proof would amount to a denial of a fair trial. State v. Myers and State v. Poffenbarger, both supra, and cases cited. Such is not the case here. See State v. Schreck, 231 Iowa 542, 1 N.W.2d 690.

Defendant's contention that there was no showing he ever dealt with Deere seems to indicate he believes the State must show there had been some actual dealings or transactions between these parties before such a charge could be maintained. This is not correct. In the first place there is substantial testimony that Keyser knew the scrap he sold Alter was to be used and paid for by Deere. Although he denied it, a State's witness said he directed that bills of lading be made to Deere, after previous conversations with the broker, Alter. The inference is clear that Keyser knew that the last 25 percent of his pay came to him when Deere paid for the scrap at the agreed price on weight. Any attempt to alter weights of cars of scrap to be delivered to Deere through Alter, then, not only would be an intent to obtain money under false pretenses from Alter but from Deere as well.

It appears that Keyser always advised Alter when a purchase order was received from Deere which it wanted Keyser to fill. True, Alter, the broker, was designated as shipper on the bills of lading, but they were prepared at Keyser's request and the last 41 shipments went direct to Deere. The jury could thus find that Keyser knew Deere was the one who would pay for the scrap and, in case of weight falsification, would be, as intended, an ultimate loser. When the concert of action was later sufficient-

ly proven, we think there was an adequate connection to sustain the charge as to Count II.

Defendant's claim that none of the reweighed cars was sold to Alter and thus no weight misrepresentation could have been made to Alter is also without merit. There is testimony that both groups were originally intended for Alter, that the consignee of the first three cars was changed before delivery, and the second four cars were orally committed to Alter for Deere prior to the issuance of the bills of lading. In both cases the evidence of intent to sell this scrap to Alter was sufficient to sustain the charge in Count I.

Mr. Smith testified the custom of the trade was to make a verbal order and acceptance between a broker and a dealer a binding agreement, and that he had verbally ordered the four cars on November 13 which were weighed and reweighed on November 15. He said he had been assured by Keyser that they were for Alter on the Deere commitment. The fact that the fraud was never consummated by forwarding bills of lading did not prevent the existence of a conspiracy to do so if a concert of action intent thereon is made to appear. State v. Thompson, supra, 241 Iowa 16, 22, 39 N.W.2d 637, and citations.

III. Error is assigned in the admission of evidence relating to a weight shortage in the Deere scrap pile because no conspiracy to defraud Deere was proven as charged in Count II and because no conspiracy to defraud Alter was proven as charged in Count I. It is true when this evidence was offered, the State had not yet introduced its proof of a concert of action, nor connected Keyser with any attempt to defraud Deere. However, the rule is well settled that the trial court has considerable discretion in ruling on the admissibility of circumstantial evidence, especially that which can later be connected up. An especially wide latitude is usually allowed in admitting it where, as here, direct testimony is lacking. State v. Myers, supra; State v. Hiatt, 231 Iowa 499, 507, 1 N.W.2d 664, 668, and citations. Having determined a concert of action was later shown, there was no abuse of the court's discretion and no merit in the assignment.

In State v. Olson, supra, 249 Iowa 536, 559, 86 N.W.2d 214,

we held if the evidence later connected up leads to a reasonable inference, not a mere suspicion, of the fact sought to be proven, it is admissible. We quoted with approval therein the statement in 15 C. J. S., Conspiracy, section 92b, pages 1141 to 1144, as follows : "The prosecutor has the right to show the whole history of the conspiracy from the commencement to its conclusion. It is no objection that the evidence covers a great many transactions and extends over a long period of time * * *." Nevertheless, we believe this evidence did no more than raise an inference that Deere was being shorted in weights, and that Deere was one of the actual and intended victims of Keyser's plan to defraud.

While the evidence as to the *amount* of the shortage might have been excluded, the vice thereof, if it was error, was clearly eliminated by the skillful cross-examination of defendant's counsel and was harmless error. It disclosed the estimated Deere loss could not alone be accounted for by the 41 carloads of scrap furnished by Keyser. The entire weight of that scrap would be far less than the estimated shortage of 752 tons. It was also pointed out none of the 453 cars of scrap purchased at various places over that period from April to October was reweighed. Thus it is not likely the jury was unduly prejudiced against Keyser by this preliminary testimony. There was no fair or reasonable implication possible that Keyser was being charged with causing all this past Deere shortage. We think the trial court was within its discretion in admitting this evidence as a circumstance leading to a reasonable inference of the fact sought to be proven, i.e., the extent of the conspiracy to defraud by short-weighing scrap on the Waterloo scale.

Evidence of the weighing and reweighing of the last seven cars, and of the circumstances leading to the arrest of Coffman, was clearly admissible. As previously pointed out, the investigation was intensified when the reweigh of three cars originally billed to Deere through Alter disclosed a shortage of some 84,000 pounds each. When the next four cars loaded for Alter for commitment to Deere were weighed, the man in the scale pit was discovered. Testimony as to these events, and of the conversation and relationship between Keyser and Coffman was proper, for it led to a reasonable and strong inference of a concert of

action between them to alter the car weights. Although Keyser denied some of the conversation attributed to him, the jury could find it disclosed more than an acquaintanceship or reasonable concern over the arrest of one's employee. There was no apparent reason for Coffman's presence in the scale pit except to manipulate the scale, which would only benefit defendant. There was no error in the admission of this testimony.

IV. Finally, defendant contends the trial court erred in admitting the opinion of Baker, the State's scale expert. He contends Baker's answer, by his own admission, took into consideration facts not in evidence or in the propounded question. It is true the witness on cross-examination said he also took into consideration the age, type and condition of the scale referred to. On redirect examination the witness said he had inspected this scale and scale pit prior to giving testimony. He said it was a 40-year-old scale of the type used in railroad yards and was in good working order. Thus the jury was apprised of all the factors considered by the expert when he opined that a 150-pound weight placed 18 inches from the end of the traverse lever on this scale would increase the recorded weight 39,000 pounds each time it was used, or a total of 78,000 pounds for an entire car, which because of its length had to be weighed twice. No prejudice could arise from admitting this opinion. The jury was properly instructed as to its value or weight. No objection to this Instruction No. 14 appears. The assignment is without merit.

V. Having carefully examined the record and the transcript filed herein, we find no prejudicial or reversible error, and conclude the conviction as well as the judgment and sentence of the trial court must be affirmed.—Affirmed.

All JUSTICES concur except HAYS, J., not sitting.