STATE of Iowa, Appellee,

v.

Paul BLYTH et al., Appellants.

STATE of Iowa, Appellee,

v.

Ralph BAUER et al., Appellants.

Nos. 55974, 56784.

Supreme Court of Iowa.

Feb. 19, 1975.

James A. Brewer, Ames, Eugene Davis and David J. Grace, Des Moines, for appellants.

Richard C. Turner, Asst. Atty. Gen., Gary H. Swanson, William R. Stengel, Jr., and John D. Hudson, Asst. Attys. Gen., for appellee.

MASON, Justice.

These two appeals by individual and corporate defendants from judgments imposed following their conviction by a jury of violating section 553.1, The Code, have been consolidated for review in this court. Their trials had followed indictment by a Story County grand jury accusing 74 International Harvester dealers throughout Iowa of violating this statute by entering into an agreement to fix prices of International Harvester parts.

Appellants are some of the 142 corporations and individuals originally indicted. A number of others had been dismissed on pretrial motions. Other motions attacking the indictment and statute were overruled. These rulings give rise to the first four issues stated by appellants for review.

There were three jury trials. In the first ten individuals and six corporations were tried and convicted. They are the appellants in number 55974. Following the first trial plea bargaining resulted in certain defendants entering pleas of guilty and dismissal of indictments as to others.

None of the defendants were convicted in the second trial, there being one directed verdict, six not guilty verdicts and a hung jury as to nine defendants.

In the third trial 13 individuals and four corporations were tried. Eight were acquitted, three had a hung jury and six were convicted. The trial court ordered a dismissal as to one of those convicted and another has died. The remaining four are appellants in cause number 56784.

Contentions of appellants in both cases relating to the trial court's refusal to sustain defendants' motion for directed verdict, its rulings on evidence adverse to defendants and alleged errors in the court's instructions give rise to the three remaining issues presented for review by these appeals.

At the time of the first trial there were approximately 154 International Harvester dealers in Iowa. Some International Harvester dealers sell both trucks and farm equipment machines while others sell only farm equipment. All dealers sell parts for equipment.

International Harvester Company prepares and distributes to its dealers various price books for the sale of repair or replacement parts which it revises twice yearly. The red book (201 series) covers farm machine equipment parts. The green book (300 series) covers parts for trucks, tractors, engines and construction equipment. Together they contain about 300,000 parts.

There are various columns in these books providing different price ranges but each dealer is free to set his own retail price. The International book has this statement: "Dealers or distributors using this list are advised that the prices contained herein are not intended, nor should they be interpreted, to be determinative of the resale prices of such dealers or distributors."

In addition to these price books International offers to its dealers for a price a computer service which is referred to in the record as a service part inventory management. A subscriber to this service may dictate to the computer a price level higher than the list price in International's suggested price books without objection from the company. The service is described as very expensive.

Prior to 1969 certain discounts were available to the dealers in connection with their purchases from International including a 2.5 percent volume discount, a two percent cash discount, a special item discount and what is referred to in the record as CT discount described as an incentive rebate on classified trade parts.

The incentive rebate discounts were terminated effective January 1, 1971. Cash discounts had already been eliminated and in 1970 the volume discount was discontinued.

The record discloses that starting in about 1966 International Harvester Corporation had sponsored "Dealer Council" meetings for motor truck dealers. The dealers would elect representatives and formulate an agenda. The representatives would then go to Chicago for meetings with company officials at which time they would present the dealers' points of view on various problems.

Some 10 to 12 farm equipment dealers within a 60-mile radius of Emmetsburg in northwestern Iowa had been attending meetings for about seven years before the indictment. Although this group had no organizational structure the dealers met to

exchange views, equipment lists and discuss general problems. After the discounts previously mentioned had been eliminated, this group felt it would be a good idea to have a state-wide setup in the farm equipment end of the business similar to that instituted among motor truck dealers.

In order to find out what were the important problems common to the farm equipment dealers as a whole a questionnaire was sent to the dealers in the northwestern Iowa group. These questionnaires were returned to the Estherville Implement Company and tabulated. Evidently, later the questionnaire was sent to all dealers in Iowa.

Shortly thereafter International Harvester Company called a dealer council meeting to be held in Des Moines during January 1971. This council included district offices in eight or ten midwestern states with three dealer representatives from each state. Earlier in January a number of implement dealers in the state of Iowa met at Ames to set up an agenda for the three people who were to serve on the dealer council to discuss with the International Harvester personnel at the meeting to be held later that month in Des Moines. One of the topics discussed at that meeting concerned parts margins. March 30 a meeting of dealers was held in Ames for the purpose of reporting to the dealers what the International personnel had to say at the Des Moines meeting in regard to price margins and other items as well.

In the discussion following the report it developed many dealers were pricing their repair and replacement parts at levels other than those which were in the International Harvester parts price books. The mechanics of figuring prices in this manner was discussed and said to be cumbersome. The possibility of securing a parts price book which would make calculation easier was brought before the group.

Mr. Hendrickson, one of the defendants, stated he knew some dealers in Minnesota who had investigated the possibility of developing such a price book. It was decided Hendrickson would check his source of information to find out more about this project since the cost of such a publication was a matter of concern.

An employee of another dealer mentioned that his company which also had a Ford farm equipment dealership had for many years purchased parts price books from a printer containing a markup of 10 percent over the prices suggested by Ford.

Following this meeting Jack Harms, another defendant, contacted a printer from Huron, South Dakota, about the probable cost of printing revised price parts books. He received a quotation from this printer that he could print such revised books, with a 10 percent increase over that shown in Harvester Company books, for an estimated $10,000 for one book explaining the additional cost for printing 100 such books would be the price of the paper or approximately two to three dollars per book.

After receiving this information it was decided an inquiry should be conducted to determine whether enough dealers would be interested in buying such a book to make the project feasible. In this connection Harms sent a letter to one dealer in each zone throughout the state explaining the cost of printing. The zone representatives were asked to contact the dealers in their zone to see if any would be interested in ordering a book. If so, they were to send their check for $100 payable to IH Dealer Council to Harms at Everly. This cost was based upon an anticipated order of 100 books. There was also a $10 fee for postage and expenses.

Eventually, about 75 Iowa dealers purchased the revised books which became available in July. Many were distributed July 14, 1971, at a second Ames meeting which had come to the attention of the attorney general's office. State agents were present and observed the distribution. There were also regional zone meetings at Red Oak, Harlan and Winterset where fur-

ther distribution was made to those dealers who had paid the $100.

Further investigation by state agents led to the matter being brought to the attention of the grand jury.

The first person named in the indictment was Jack Harms and in the three trials mentioned and in these two appeals the case has carried the caption, "State of Iowa v. Jack Harms, et al." However, pursuant to a court order the indictment was amended so as to place the names of defendants in alphabetical order. Defendants are listed in the same manner in the caption of this opinion.

The body of the indictment as it appears in the record is in these words:

"THE GRAND JURORS of the County of STORY in the name and by the authority of the State of Iowa accuse * * * [the individual and corporate defendants as named in the first amendment] of the crime of conspiracy in violation of Section 553.1, Code of Iowa, 1971, and charge that the above named persons and corporations did, between about January 1, 1971 and August 31, 1971, create, enter into, and become members of, parties to and partners in an agreement, combination, confederation and understanding among themselves and with each other to regulate and fix the prices of International Harvester parts sold in this state."

The statute referred to provides:

"Pools and trusts. Any corporation organized under the laws of this or any other state or country for transacting or conducting any kind of business in this state, or any partnership, association, or individual, creating, entering into, or becoming a member of, or a party to, any pool, trust, agreement, contract, combination, confederation, or understanding with any other corporation, partnership, association, or individual, to regulate or fix the price of any article of merchandise or commodity, or to fix or limit the amount or quantity of any article, commodity, or merchandise to be manufac-

tured, mined, produced, or sold in this state, shall be guilty of a conspiracy."

The dealers on trial in the first trial were individuals who had been asked to find out which dealers in their respective zones wished to order a set of revised price parts books.

Each defendant convicted in the third trial attended at least one meeting where the books and parts pricing were discussed. Each purchased the X series books and used them in their business.

I. Some months before trial defendants filed motion to set aside the indictment and a demurrer which they amended twice.

The exclusive grounds for setting aside an indictment where no bill of particulars has been granted are set out in section 776.1, The Code. In the trial court defendants relied on three of these statutory grounds. However, on appeal their challenge to the adverse ruling on their motion is based on subsection 6 of this statute. The pertinent portion of section 776.1 provides:

"Grounds for setting aside indictment. The motion to set aside the indictment can be made, before a plea is entered by the defendant, on one or more of the following grounds, and must be sustained:

" * * *

"(6) When any person other than the grand jurors was present before the grand jury during the investigation of the charge, except as required or permitted by law."

Defendants claim this provision was violated in two respects: first, because the attorney general and his assistants were present with the grand jury during its investigation allegedly without authority, and second, because one of the grand jury clerks, Diann Nelson, was present on September 17, 1971, at a time when she was not acting as clerk.

State v. Hansen, 215 N.W.2d 249, 252 (Iowa 1974), has this statement:

"It is well settled no one may appear before that body [the grand jury] except a witness who is called to testify and certain others who are authorized by law to be present for official reasons. 38 Am.Jur.2d, * * * [Grand Jury], section 34, contains this statement of the principle:

" 'Generally, the presence of persons other than the grand jurors, witnesses under examination, and the prosecuting attorney during the sessions of the grand jury is considered unauthorized or improper.'

"Another applicable rule is stated in 41 Am.Jur.2d, Indictments and Informations, section 252, page 1035 (1968):

" 'Under a statute requiring that an indictment be set aside if an unauthorized person was present while the grand jury had the charge under consideration, an indictment must be dismissed, regardless of prejudice to the defendant, if two witnesses are present while the testimony of one or both is given.'

"Some jurisdictions demand a showing of prejudice before a violation of such a statute justifies quashing an indictment. Others hold nothing need appear except the violation itself. We believe our cases support the latter view."

The *Hansen* opinion then quotes from State v. Bower, 191 Iowa 713, 715, 183 N.W. 322, 323 and Maley v. District Court, 221 Iowa 732, 737–739, 260 N.W. 815, 818–819 and cites other authorities in support.

■ Thus, the question is whether the sworn-in, but not yet acting, clerk and the attorney general and his assistants are persons "required or permitted by law" to attend grand jury investigations since prejudice need not be shown, simply that an appearance was unauthorized.

As to the attorney general's presence, the State contends it is permissible for him to attend such proceedings. Section 13.2, The Code, 1971, provides in part:

"Duties. It shall be the duty of the attorney general, except as otherwise provided by law to:

" * * *

"2. *Prosecute and defend* in any other court or tribunal, all actions and proceedings, civil or criminal, in which the state may be a party or *interested,* when, in his judgment, the interest of the state requires such action, or when requested to do so by the governor, executive council, or general assembly. * * *." (Emphasis supplied).

The State maintains the attorney general may *appear* and act before the grand jury. Cosson Atty. Gen. v. Bradshaw, Judge, 160 Iowa 296, 300, 141 N.W. 1062, 1063 is relied upon. In the *Cosson* case the attorney general had moved the trial court for permission to appear in person and by his assistant before the grand jury in Marshall county. The motion was resisted by the county attorney. Following a hearing the court overruled the motion, denying permission to the attorney general to appear as requested. Certiorari was brought and the order denying permission was annulled on the ground the statute involved, Acts of the Thirty-third General Assembly, chapter 9, section 3, allowed the attorney general to appear before the grand juries of the several counties of the state under conditions specified in the statute.

The parts of that statute pertinent here provided:

"It shall be the duty of the attorney general:

" * * *

"2. When requested to do so by the governor, executive council, or general assembly, or when in his judgment the interests of the state require it, he shall *appear* for the state before any other court or tribunal, prosecute or defend all actions and proceedings, civil or criminal, in which the state may be a party or interested. * * *." (Emphasis supplied).

The Supreme Court held "tribunal" included grand juries, and thus the attorney general could so appear.

Defendants, on the other hand, maintain change in the wording of the two statutes

brought about by the enactment of the Extra Session of the Fortieth General Assembly removed this right since section 13.2 does not grant authority to "appear" as such but simply states the attorney general may "prosecute and defend."

Defendants contend a grand jury investigation is not a prosecution and point out that at no time did the Story county attorney appoint the attorney general or any member of his staff as an assistant county attorney or special prosecuting attorney.

There is no contention, as we understand defendants' argument, that either the attorney general, his assistants or Diann Nelson were present during the deliberations of the grand jury on the evidence or while that body was voting on the matter under investigation. Their complaint is directed to the activity of the attorney general's office in examining witnesses, introducing and identifying exhibits and generally directing the course of the investigation.

The *Cosson* case, although determining primarily that it was the legislative intent by the use of the word "tribunal" in the statute as then in force to authorize and empower the attorney general to appear before the several grand juries of the several counties of the state whenever, in his judgment, the interest of the state required him to do so, is certainly support for the proposition the attorney general or his assistants had the authority under that statute to appear before the grand juries of the several counties to present evidence in matters in which the state of Iowa is a party or interested.

Defendants argue the *Cosson* case must be distinguished however in view of the subsequent amendment which deleted the words "he shall appear for the state before any other court or tribunal" from the statute under consideration by the court in that case.

The following general principle is set out in 1A Sutherland Statutory Construction, section 22.30, Fourth ed. (Sands Rev.):

"The courts have declared that the mere fact that the legislature enacts an amendment indicates that it thereby intended to change the original act by creating a new right or withdrawing an existing one. Therefore, any material change in the language of the original act is presumed to indicate a change in legal rights. The legislature is presumed to know the prior construction of terms in the original act, and an amendment substituting a new term or phrase for one previously construed indicates that the judicial or executive construction of the former term or phrase did not correspond with the legislative intent and a different interpretation should be given the new term or phrase. Thus, in interpreting an amendatory act there is a presumption of change in legal rights. This is a rule peculiar to amendments and other acts purporting to change the existing statutory law."

The foregoing statement finds support in Des Moines Ind. Com. Sch. Dist. v. Armstrong, 250 Iowa 634, 645, 95 N.W.2d 515, 521 and Holland v. State of Iowa, 253 Iowa 1006, 1013, 115 N.W.2d 161, 165, as a declaration of a general proposition.

However, as noted by the author in the cited treatise, an amendatory act is not to be construed to change the original act or section further than expressly declared or necessarily implied. Bennett v. Greenwalt, 226 Iowa 1113, 1132–1135, 286 N.W. 722, 731–733 supports this position.

In this state the duties and powers of the attorney general are defined by statute. He is clothed with common law powers only to the extent codified in the statute. This court has expressed the view the legislature has given him by statute all powers which in its judgment he ought to be permitted to exercise. State ex rel. Turner v. Iowa State Highway Com'n, 186 N.W.2d 141, 145–146 (Iowa 1971) and authorities cited.

Assuming without deciding, which we do not, that there is a distinction, as defend-

ants maintain, between authority to "appear" before the grand jury and the authority to "prosecute and defend" the problem is whether the Extra Session of the Fortieth General Assembly in 1924 by omitting the quoted phrase from the previous statute in enacting what is presently section 13.2, The Code, intended to withdraw authority granted the attorney general by the earlier statute to appear and examine witnesses and produce evidence before the several grand juries of the state.

In order to sustain defendants' position this court would have to construe section 13.2 as expressly withdrawing authority of the attorney general to so appear before the grand juries or conclude a proper construction of section 13.2 required withdrawal of such authority as a necessaary implication of the amendatory act. In our view such construction is unwarranted.

■ The court now construes section 13.-2, The Code, as authorizing the attorney general to appear and examine witnesses and produce evidence on matters under investigation by a grand jury in the several counties of the state in which the state is a party or interested, except as otherwise provided by law.

■ The trial court was correct in its ruling in the respect considered in this division. The 1924 amendatory act did not have the effect of eliminating authority of the attorney general to appear before the grand juries of the several counties of the state.

■ II. Defendants contend Diann Nelson was an unauthorized person appearing before the grand jury during its investigation of the matter involved in the present indictment. The record discloses Christine G. Shedd, a certified shorthand reporter, served as one of the clerks of the Story County grand jury during such investigation. Other certified shorthand reporters served as clerk of this grand jury during these proceedings. September 17, 1971, Diann Nelson who had been previously sworn as a clerk but had not yet served came into the grand jury room while the grand jury was in session and observed the proceedings for a time but did not perform her functions as clerk until later days. Miss Shedd was acting as clerk on that day recording the testimony.

Defendants maintain there is no statutory provision for the appointment of an assistant clerk in counties with populations less than 120,000 inhabitants. Story County did not have such population.

The trial court held Nelson was not an unauthorized person since she had previously taken her oath and was bound by it; the statute does not prevent a court from having the same grand jury served by more than one person as clerk. The court expressed the view if she thought it was necessary to observe another clerk briefly to acquaint herself with her duties, this was not unreasonable.

This is not the factual situation presented in State v. Hansen, 215 N.W.2d 249 (Iowa 1974).

Defendants' contention is without merit.

III. Defendants assert section 553.9, The Code, 1971, is unconstitutional in that it allows the attorney general and county attorney up to one-fourth of the fines assessed against defendants.

They first argue they were denied due process under Article I, section 9 of the Iowa Constitution and under Amendment 14 to the United States Constitution in that an economically interested attorney general appeared at the grand jury proceedings.

Defendants also contend the statute gives a prosecutor a "private profit motive and pecuniary interest in seeing that indictments are brought and convictions secured," and thus denies due process.

The State counters the attorney general had no pecuniary interest in seeing an indictment handed down. Also, the conviction, resting in the hands of an unbiased jury, was not reached by anyone with an economic interest.

The State further argues the statute in and of itself does not deny due process and that defendants have not shown violation of specific due process rights.

Section 553.9, since repealed by the Acts of the First Session of the Sixty-fifth General Assembly, chapter 277, section 1, provided:

"Fees of prosecutors. Any county attorney or the attorney general securing a conviction under the provisions of sections 553.1 to 553.7, inclusive, shall be entitled, in addition to such fee or salary as by law he is allowed for such prosecution, to one-fifth of the fine recovered. When the attorney general and county attorney act in conjunction in the prosecution of any action under such provisions, they shall be entitled to one-fourth of the fine recovered, which they shall divide equally between them, where there is no agreement to the contrary."

The trial court in disagreeing with defendants' arguments stated:

" * * * However, as repugnant as such statutory provisions may be to those who believe all prosecutions ought to be instigated only out of a sense of duty in consideration of a fixed salary, there is nothing in this statute which denies an accused any of the rights held by those subject to statutes without such provisions. 'Due process' is equally applicable, and is not denied by the statute here involved. Apart from this, even if this portion of the statute was unconstitutional, it is clearly severable from the part of the statute which establishes the offense. See 82 C.J.S. Statutes § 93. It deals only with what is done after a conviction if a fine is imposed and collected. In its absence the whole fine would simply go to the school fund like other fines."

Under the provisions of section 553.3 the trial court was required to assess a fine against each corporate defendant convicted of not less than $500, nor more than $5000, and against each individual defendant a fine of not less than $500, nor more than $5000, or imprisonment in the county jail, not to exceed one year, or by both such fine and imprisonment. In any event, upon conviction the court, in assessing a fine, could not impose less than $500.

Defendants' arguments in support of their constitutional challenges are based mainly upon three United States Supreme Court cases: Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749; Ward v. Village of Monroeville, Ohio, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267; and Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488.

Assuming arguendo section 553.9 is subject to defendants' constitutional attack based on due process grounds such determination would not aid them if this section is capable of separation in fact from the remainder of chapter 553 without destroying the legislative intent and purpose of that chapter.

■ Separability questions are essentially questions of statutory construction. 2 Sutherland Statutory Construction, section 44.03. This court has dealt with the well-settled rules of statutory construction in several cases. See Janson v. Fulton, 162 N.W.2d 438, 442–443 (Iowa 1968); State v. Vietor, 208 N.W.2d 894, 897 (Iowa 1973); State v. Jennie Coulter Day Nursery, 218 N.W.2d 579, 582 (Iowa 1974); and authorities cited in these opinions. It has been said "the cardinal principle of statutory construction is to save and not to destroy." Tilton v. Richardson, 403 U.S. 672, 684, 91 S.Ct. 2091, 2098, 29 L.Ed.2d 790, 802.

Standards or formulae believed to be helpful in determining the issue of severability are recognized in Smith v. Thompson, 219 Iowa 888, 258 N.W. 190; Kruidenier v. McCulloch, 258 Iowa 1121, 1140–1142, 142 N.W.2d 355, 366–367, cert. den., 385 U.S. 851, 87 S.Ct. 79, 17 L.Ed.2d 80, supplemented, 261 Iowa 1309, 158 N.W.2d 170; Lee Enterprises, Inc. v. Iowa State Tax Com'n, 162 N.W.2d 730, 741 (Iowa 1968); and Frost v. State, 172 N.W.2d 575, 586 (Iowa 1969).

Guidelines which serve as an aid in determining severability of statutes are summarized in this fashion in 82 C.J.S. Statutes § 93:

"Whether the valid and the invalid parts of a statute are independent and separable, or interdependent, is a question of construction and of legislative intent, as indicated by the words employed and the considerations underlying the enactment of the statute, and the question is not one of legislative power. A statute may be unconstitutional in part and yet be sustained with the offending part omitted, if the paramount intent or chief purpose will not be destroyed thereby, or the legislative purpose not substantially affected or impaired, if the statute is still capable of fulfilling the apparent legislative intent, or if the remaining portions are sufficient to accomplish the legislative purpose deducible from the entire act, construed in the light of contemporary events.

"If, when the invalid part is stricken, that which remains is complete in itself and capable of being executed in accordance with the apparent legislative intent, or purpose, wholly independent of that which was rejected, it must be sustained to that extent; * * * ."

From the foregoing statement of law it is fair to say the test is whether the sections of chapter 553 remaining when section 553.9 is omitted therefrom are so independent as to form a complete act capable of fulfilling the legislative intent in enacting the chapter.

The present problem is not one of deleting single words, clauses or phrases from a section of a legislative act but rather one of removing an entire section of the act.

A reading of chapter 553 compels the conclusion the dominant or main purpose of the act would not be defeated, changed or altered by deletion of section 553.9. In our opinion rejection of this section would not generate any uncertainty as to the nature of the offense established in sections 553.1 and 553.2 or make it difficult for a person to be informed of the type of conduct prohibited. Section 553.9 is not so interrelated to the remaining sections of the chapter in treatment of the offense proscribed as would justify the court in saying the legislature would not have passed the act without the offending section.

The court therefore holds section 553.9 is severable from the remaining sections of this chapter. The trial court was correct in refusing to dismiss the indictment on the basis of this attack.

IV. Defendants assert section 553.1 is additionally unconstitutional as abridging freedom of speech under Amendment 1 to the United States Constitution and Article I, section 7 of the state constitution. The contention is based upon the fact no "overt act" is required to violate section 553.1.

Defendants assert the statute "creates a crime by either agreeing to or becoming a member of a group which may regulate or fix prices, so that if a person was a member of a group or entered into an understanding to fix prices but did not in fact carry out the agreement, he would be guilty of a crime as set forth in section 553.1, Code of Iowa."

Defendants rely heavily upon Brandenburg v. Ohio, 395 U.S. 444–445, 89 S.Ct. 1827, 1828, 23 L.Ed.2d 430, where defendant leader of a Ku Klux Klan organization was convicted under the Ohio Criminal Syndicalism statute for " 'advocat[ing] * * * the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform' and for 'voluntarily assembl[ing] with any society, group, or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism.' "

In holding the statute unconstitutional as violative of free speech, the Court stated, " * * * the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting

or producing imminent lawless action and is likely to incite or produce such action." *Id.,* 395 U.S. at 447, 89 S.Ct. at 1829, 23 L.Ed.2d at 430. See also Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 and Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356.

The court proceeded by quoting from Noto v. United States, 367 U.S. 290, 297–298, 81 S.Ct. 1517, 1520–1521, 6 L.Ed.2d 836: " '[T]he mere abstract teaching * * * of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.' " *Brandenburg,* 395 U.S. at 448, 89 S.Ct. at 1830, 23 L.Ed.2d at 434. Since the statute did not draw this distinction and punished "mere advocacy," it was declared unconstitutional.

The State counters *Brandenburg* is inapplicable as that case involved "pure speech and advocacy of action," not a conspiracy "where persons assembled together * * arrived at an 'agreement, contract, combination, confederation, or understanding' in violation of a public statute." Section 553.1 does not regulate speech or advocacy, but the "consummation of the illegal agreement."

■ The advocacy of breaking the law (e. g. the violent overthrow of the government, counselling draft resistors) is speech, whereas entering into an *agreement* to fix prices may hardly be said to be speech, symbolic speech, or expression under the ambit of Amendment 1.

■ Even if section 553.1 regulates speech, "the fact that a seemingly normal criminal statute, by virtue of its prohibition of conspiracy and crime counselling, may in some instances apply to affect freedom of association or freedom of speech does not invalidate the statute." United States v. Spock, 416 F.2d 165, 173, n. 20 (1 Cir. 1969), citing United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. See also State v. Kool, 212 N.W.2d 518, 521 (Iowa 1973).

Defendants claim since no "overt act" is required to violate section 553.1, the section is unconstitutional. On this point they misappraise the drift of conspiracy.

■ "The crime of conspiracy is a combination or agreement between two or more persons to do or accomplish a criminal or unlawful act, or do a lawful act in an unlawful manner." State v. Jennings, 195 N.W.2d 351, 356 (Iowa 1972). See also State v. Schenk, 236 Iowa 178, 183, 18 N.W.2d 169, 172; State v. Thompson, 241 Iowa 16, 22, 39 N.W.2d 637, 641; State v. Keyser, 257 Iowa 73, 79, 130 N.W.2d 701, 704; and Stover v. Hindman, 159 N.W.2d 422, 425 (Iowa 1968).

■ "We are concerned here with a criminal or unlawful act, the gist of the crime being the unlawful agreement or combination with intent to defraud. It does not depend upon the fulfillment of the act. * * * It may be established by either direct or circumstantial evidence." State v. Keyser, 257 Iowa at 79, 130 N.W.2d at 704. See also State v. Blackledge, 216 Iowa 199, 205, 243 N.W. 534, 536; State v. Moore, 217 Iowa 872, 877, 251 N.W. 737, 740; and State v. Olson, 249 Iowa 536, 562, 86 N.W.2d 214, 229–230.

■ Thus, so long as an agreement to fix or regulate prices existed, it is irrelevant whether one carries it out or not. That states have the power to prohibit such agreements is not questionable. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224, 60 S.Ct. 811, 845, 84 L.Ed. 1129, n. 59 and Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498, 69 S.Ct. 684, 688, 93 L.Ed. 834, 841, where the Court continued, "It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."

It is the court's opinion section 553.1 is not open to the constitutional attack in the respects urged by defendants.

V. The remaining issue for review stemming from the trial court's adverse rulings on defendants' demurrer and motion to set aside the indictment concerns absence of grand jurors during the investigation leading to the present indictment.

Defendants had asserted in their demurrer various members of the grand jury were absent during a number of sessions when evidence was received from witnesses.

At a hearing on defendants' motion and demurrer and the State's resistance thereto the trial court took evidence bearing on this question. The record discloses that during the 16-day investigation somewhat over 14 man days were missed. One juror was absent five days, or almost one third of the time.

In its ruling the court found from a conflict of testimony that at least five grand jurors—the legal quorum—but not always the same five, were present at all proceedings, although no one grand juror was present during all the testimony.

Defendants assert the absence of grand jurors from the grand jury investigation at different times was contrary to law rendering the indictment void.

They maintain the indictment is invalid since allowing jurors who had been absent at times to vote on the indictment denies due process and equal protection. Citing no authority in point defendants reason equal protection was violated since often persons charged with crimes have their indictments handed down during one-day investigations where all jurors are present. This being the case, where the instant defendants were indicted by a grand jury where *all jurors did not hear all testimony*, they were denied equal protection.

This precise issue has not been considered in Iowa. Further, our cases dealing with grand jury quorum requirements are somewhat antiquated.

Constitutionally, the number which constitutes a legal quorum in Iowa may not be less than five. Amendment of 1884, Amendment 3, Constitution of the State of Iowa; section 772.1, The Code.

Section 770.1, "Drawing grand jurors," provides in part: " * * * [T]he names of twelve persons constituting the panel of the grand jury, * * * shall * * * be placed by the clerk in a box, and * * * he shall draw therefrom seven names, and the persons so drawn shall constitute the grand jury for that calendar quarter. Should any of the persons so drawn be excused or fail to attend on the day designated for their appearance, the clerk shall draw other names until the seven grand jurors are secured."

This statute deals with the selection of the jury at the outset. It requires the jury consist of seven members. The wording does not deal with situations where jurors are absent on occasion during the actual investigation. The instant facts show the grand jury actually was made up of seven persons. Thus, 770.1 is not pertinent to the issue.

However, section 770.9 is somewhat more troubling. It provides in part:

"Summoning additional jurors. If such grand jury has been reduced to a less number than seven by reason of challenges to individual jurors being allowed, or from any other cause, the additional jurors required to fill the panel shall be summoned. * * The persons so summoned shall serve only in the case, or cases, in which, by reason of challenges, or other causes, the regular panel is set aside or is insufficient in number to find an indictment."

One could imply here if a juror is absent at any time during the investigation of the charge he should be replaced by another. Such a construction and moreover its application would, however, be less than viable. Would the statute require an ill juror to be replaced for one day by another? In this situation it is difficult to understand what good such a replacement would do. If, for example, a juror is absent on the last day, it would be absurd to require his replacement for this last day. The substitute juror

would be hard put to make any fair evaluation of the guilt of the accused. The legislature could not possibly have intended this to be the rule.

Both sides here cite and distinguish Iowa cases dealing with grand juries. In State v. Ostrander, 18 Iowa 435, 440 (1865), the statutes provided, "when grand jurors are to be selected, their number must be fifteen." Another section provided, "if the fifteen do not appear (at court), or if the number appearing be reduced from any cause, either then or afterwards, to less than fifteen, the court may order the sheriff to summon a sufficient number of qualified persons to complete the panel."

At that time, twelve jurors were required to concur in finding an indictment, and the court held the entire fifteen need not be present at such finding. The reference to fifteen did not refer to quorum requirements. Thus, the indictment handed down by a grand jury consisting of less than fifteen members was valid, where twelve concurred in the result. There was no provision requiring the entire fifteen members to be present all of the time.

In *Ostrander* defendant's challenge to one of the jurors had been sustained whereupon the court directed that juror when defendant's case came up for examination to retire from the grand jury room and take no part in the examination. This is not a case where one juror was absent during a part of the investigation as here. The case is not directly in point. Here, the grand jury did consist of the statutorily required seven members, except during times some jurors were absent.

In State v. Shelton, 64 Iowa 333, 336, 20 N.W. 459, 461 (1884), defendant challenged four members of the grand jury. The challenge was sustained as to three and overruled as to the fourth. Defendant's request that the court order the panel to be filled with the selection of three additional jurors was overruled. This was a point complained of on appeal. Thus, three of the fifteen jurors were prohibited from acting on the grand jury, but the remaining twelve concurred in finding the indictment. The court stated, "The result to the defendant could not have been changed by the addition of three other jurors to the panel, even though each one of those so added had opposed the finding of the indictment." Again, *Shelton* did not deal with the situation instantly presented. From both *Shelton* and *Ostrander* one deduces the rule laid down to be a jury consisting of the legal and common law quorum may validly find an indictment.

Finally, defendants rely upon State v. Belvel, 89 Iowa 405, 410–411, 56 N.W. 545, 547. There the statute required grand juries to be composed of seven members out of twelve drawn in counties of 16,000 or more population. That grand jury consisted of five people, with only eight names originally drawn for it. Defendant contended seven members were mandatory, and the court stated, "It is true that the right is guaranteed as claimed, but the obligation to provide a grand jury of seven members in certain cases is no greater than is that to furnish a trial jury of twelve." Any error was waived since defendant did not object before pleading to the indictment.

There is nothing in the instant facts indicating seven members were not chosen from a group of twelve drawn names. *Belvel* did not reach the problem here involved.

This statement in United States v. Armour and Company, 214 F.Supp. 123, 124 (D.C.Cal.1963) reminds us that, "A Grand Jury is primarily concerned with the nature, amount and convincing force of affirmative evidence of guilt, and it is not within the province of the Grand Jury to weigh it against defensive evidence, if any, for the purpose of determining the guilt or innocence of the defendant.".

In United States v. Anzelmo, 319 F.Supp. 1106, 1115 (E.D.La.1970) it is said: "The law is clear that it is not necessary that those who vote to return a true bill be

present at every grand jury session to hear all the evidence relative to an indictment which is returned." The opinion cites the following cases in support: Lustiger v. United States, 386 F.2d 132 (9 Cir. 1967), cert. den., 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142 (1968); United States ex rel. McCann v. Thompson, 144 F.2d 604 (2 Cir. 1944), cert. den., 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630 (1944); United States v. Armour and Company, 214 F.Supp. 123 (D.C.Cal. 1963); and In re Meckley, 50 F.Supp. 274 (D.C.Pa.1943), aff'd, 137 F.2d 310 (3 Cir. 1943), cert. den., 320 U.S. 760, 64 S.Ct. 69, 88 L.Ed. 453 (1943).

A reading of the cited cases compels the conclusion this is the rule in federal court.

This is so, "since all the evidence adduced before a grand jury—certainly when the accused does not appear—is aimed at proving guilt, the absence of some jurors during some part of the hearing will ordinarily merely weaken the prosecution's case. If what the absentees actually hear is enough to satisfy them, there would seem to be no reason why they should not vote." United States ex rel. McCann v. Thompson, 144 F.2d at 607. See also United States v. Colasurdo, 453 F.2d 585, 596 (2 Cir. 1971).

Even when some grand jurors are absent when an accused testifies, it has been held the above rule still applies. United States v. Niedelman, 356 F.Supp. 979, 983 (S.D.N.Y.1973).

■ The temporary absence of members of the grand jury at various times during the taking of testimony and introduction of evidence as disclosed by the record before us did not invalidate the indictment.

VI. We turn now to a consideration of those issues presented for review by defendants' contentions relating to alleged errors occurring during trial.

Defendants insist the court erred in overruling their motions for directed verdict.

In both trials defendants moved for a directed verdict at the close of the State's evidence which they renewed at the close of

all evidence. These motions were based on the contention the evidence was insufficient to prove defendants or any of them did in Story county enter into an agreement, combination, confederation and understanding among themselves and with each other or with any other person, association, corporation or partnership to fix and regulate prices of International Harvester parts sold in the state of Iowa.

Defendants further assert the court was without jurisdiction to try defendants, Dostal, Roe or Synhorst, since it had not been affirmatively shown these persons attended the meeting in Ames.

By stipulation of the parties this motion was incorporated in defendants' motions for directed verdict made at the close of the State's evidence and renewed at the close of all evidence in the third trial.

As stated, the motions were overruled in both trials and the matter submitted to the jury.

■ When considering a motion for directed verdict the trial court is required to view the evidence in the light most favorable to the prosecution regardless of whether it is contradicted and every legitimate inference that may be fairly and reasonably deducted therefrom must be carried to the aid of the evidence. The case should be submitted to the jury and the court should not direct a verdict of acquittal if there is any substantial evidence reasonably tending to support the charge. State v. Pardock, 215 N.W.2d 344, 346 (Iowa 1974); State v. Willer, 218 N.W.2d 605, 607 (Iowa 1974); State v. Dewey, 220 N.W.2d 629, 631 (Iowa 1974); and authorities cited in these opinions.

It is undisputed prices of repair and replacement parts for International equipment were raised ten percent at varying times by all dealers who are appellants in these two matters over the prices suggested in the International price books which were in effect June 1 and September 28, 1970. There was a revision of International price books in February and June of 1971.

One thing section 553.1, The Code, condemns as a conspiracy is the entering into an agreement among competitors to fix or regulate prices of an article of merchandise or commodity sold in this state.

Thus, an agreement by the alleged conspirators is a necessary element of proof under the statute. However, it need not be express but may be proved by circumstantial evidence. It is " 'immaterial whether the agreements were ever actually carried out, whether the purpose of the conspiracy was accomplished in whole or in part, or whether an effort was made to carry the object of the conspiracy into effect.' " Plymouth Dealers' Ass'n of No. Cal. v. United States, 279 F.2d 128, 132 (9 Cir. 1960), citing United States v. Trenton Potteries, 273 U.S. 392, 402, 47 S.Ct. 377, 381, 71 L.Ed. 700, 707. See also United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224, 60 S.Ct. 811, 845, 84 L.Ed. 1129, 1165, note 59.

Defendants deny the existence of any sort of agreement between any of the Internatinal Harvester dealers to fix or regulate prices. Every dealer testified there was no explicit agreement to raise prices or to charge the same prices and no other witnesses testified there was an agreement to charge the same prices. It was asserted there was no pressure or coercion to do so either. Each dealership was left free to establish its own pricing policy.

They point to the fact price increases were put into effect by some dealers before the price books purchased from the South Dakota printer were received. Others increased their prices after receipt of the books. Pricing matters among the various dealers differed considerably due in some degree to the fact the truck and tractor price book issued by International had five columns in which various part numbers and price choices were shown. The column headed "CT" is the price suggested by International for sales to "classified trade," meaning customers with truck fleets up to seven vehicles. The column headed "con-tract" is International's suggested price for sales to governmental agencies or customers having 20 or more vehicles. Some truck dealers used the "CT" price, others did not. The price book covering repairs for farm equipment does not have a column for "CT" prices.

Defendants argue any increase in prices was not due to any alleged agreement among dealers entered into in Story county but was solely due to economic factors faced by the dealers.

The question is whether the increase was prompted by costs, operations, marketing procedure, transportation costs, margins or other economic factors or business considerations affecting like business or was the increase a product of defendants' engaging in an illegal conspiracy to fix prices.

The question presented to the trial court by defendants' motions to direct was whether there was sufficient evidence in light of the foregoing principles as to the existence of a conspiracy among the defendants to regulate or fix prices for the sale of International Harvester parts throughout the state of Iowa to warrant submission of that issue to the jury.

When the evidence is conflicting or the facts are not in dispute or contradicted, if reasonable minds may draw different inferences from them, a jury question is engendered. Schmitt v. Jenkins Truck Lines, Inc., 170 N.W.2d 632, 642 (Iowa 1969) and authorities cited.

On review the question is whether the jury in the exercise of its function as trier of facts would be justified in finding beyond a reasonable doubt defendants did in Story county enter into an agreement, combination or confederation and understanding among themselves and with each other or with any other person, association, corporation or partnership to fix and regulate prices of International Harvester parts sold in the state of Iowa.

In determining this issue this court views the evidence in the light most favor-

able to the State, including all inferences and presumptions which reasonably flow from the evidence in the record tending to support the jury's action where a verdict of guilty has been returned. It is necessary to consider only the supporting evidence whether contradicted or not. State v. Staker, 220 N.W.2d 613, 617–618 (Iowa 1974).

In light of the principles recognized in the foregoing authorities there is substantial evidence which would justify a jury in finding: (1) purchasers both from discussions at the Ames meeting and from letters from Harms knew there was an across the board ten percent price increase in the new books; (2) purchasers could only logically assume the other buyers would utilize the new books and thus "stabilize" a ten percent price increase; (3) a feeling among several dealers the new books would make their particular dealerships uncompetitive with company stores or other private dealerships; (4) the defendant individuals in the first action played an important role through contacting dealers in their zones about purchase of the books; and (5) the concern by one that everybody in the zone should follow suit or none at all.

As noted, circumstantial evidence may be utilized to establish or to permit the trier of fact to draw an inference as to the existence of a price fixing agreement, an essential element to prove defendants conspired to fix or regulate prices in violation of section 553.1.

■ However, where circumstantial evidence alone is relied on as to any one or more of essential elements the circumstance or circumstances must be entirely consistent with defendants' guilt, wholly inconsistent with any rational hypothesis of defendants' innocence and so convincing as to exclude any reasonable doubt defendants were guilty of the offense charged. The proof must generate something more than suspicion, speculation or conjecture. State v. Reeves, 209 N.W.2d 18, 21 (Iowa 1973).

The following language from Esco Corporation v. United States, 340 F.2d 1000, 1007 (9 Cir. 1965), repeated in the State's brief, is instructional:

" * * * [A]ny conspiracy can ordinarily only be proved by inferences drawn from relevant and competent circumstantial evidence, including the conduct of the defendants charged. Daily v. United States, 282 F.2d 818, 820 (9th Cir. 1960). A knowing wink can mean more than words. Let us suppose five competitors meet on several occasions, discuss their problems, and one finally states—'I won't fix prices with any of you, but here is what I am going to do—put the price of my gidget at X dollars; now you all do what you want.' He then leaves the meeting. Competitor number two says—'I don't care whether number one does what he says he's going to do or not; nor do I care what the rest of you do, but I am going to price my gidget at X dollars.' Number three makes a similar statement— 'My price is X dollars.' Number four says not one word. All leave and fix 'their' prices at 'X' dollars.

"We do not say the foregoing illustration *compels* an inference in this case the competitors' conduct constituted a price-fixing conspiracy, *including an agreement to so conspire,* but neither can we say, as a matter of law, that an inference of no agreement is compelled. * * * [I]t remains a question for the trier of fact to consider and determine what inference appeals to it (the jury) as most logical and persuasive, after it has heard all the evidence as to what these competitors had done before such meeting, and what actions they took thereafter, or what actions they did not take." (Emphasis in the original).

■ In line with this teaching this court concludes a jury would be warranted in finding from the evidence, even though circumstantial, that as a consequence of the January and March meetings of Harvester dealers in Ames, price books reflecting a general ten percent increase of repair parts were printed, published and circulated to those Harvester dealers who contributed to the cost thereof. This effected an increase

in the price of such parts in many instances, a uniform price in others and a starting point for price determination by those using the "CT" column. As to those who had increased their prices before receipt of the price book it is a fair inference to be drawn that they were interested in achieving a uniform price among Harvester dealers and to accomplish this purpose they agreed to contribute to the cost of the new price books.

The evidence would support an inference such increased prices were brought about by an agreement or understanding entered into between the dealers themselves to fix and regulate prices of articles of merchandise or commodity to be sold in this state.

Defendants' contention the trial court erred in failing to sustain their motion for directed verdict as well as their argument made in connection with this contention that the verdict is not supported by the evidence are without merit.

The trial court was correct in overruling defendants' motion for directed verdict in each case.

VII. In determining the issue arising from the trial court's rulings on evidence adverse to defendants we first consider those alleged to have occurred during the first trial.

Defendants' first complaint is directed to the trial court's adverse ruling on their objection to exhibit 101 described by Sue Rehberg, bookkeeper for Harms Implement Company, as a communication from Pella Implement to Harms Implement dated May 15, 1971. The name Henry A. Klein was typed at the bottom of the letter but it was not otherwise signed. The memo on the stationery of Pella Implement Store was among the documents seized from Jack Harms' files. It stated, "Jack: I have signed up the following dealers to go on the $100 program." There followed a list of seven dealers in Klein's zone. The exhibit then listed six "towns that said no."

Defendants objected to the admissibility on the ground the document was not signed by anyone and was hearsay since it purported to be a report by an individual who was not a defendant, an alleged co-conspirator or listed as a witness regarding a conversation Klein had had with a number of other individuals.

In their brief defendants argue the exhibit does not fall within the co-conspirators' exception to the hearsay rule. This rule has been stated in the following manner:

"Any act or declaration by one co-conspirator committed in furtherance of the conspiracy and during its pendency is admissible against each and every co-conspirator provided that a foundation for its reception is laid by independent proof of the conspiracy." Levie, Hearsay and Conspiracy, 52 Mich.L.Rev. 1159, 1161 (1954).

Attention is called to rule 801(d)(2)(E), Proposed Rules of Evidence for United States Courts and Magistrates, in regard to categorization of conduct and declarations of a co-conspirator of a party as hearsay.

Some description of the state of the record at the time exhibit 101 was offered is necessary for a determination of defendants' hearsay objection. As indicated, the offer of this exhibit was made during the State's examination of Harms' bookkeeper who identified many of the exhibits received in this case.

Before her testimony the State had submitted evidence detailing the content, distribution and purpose of the Harvester price books and the events leading to the publication and distribution of the price books printed in South Dakota. The State had also introduced evidence describing the dealer council and the events leading to and occurring during the March and July meetings in Ames. Many exhibits identified as copies of newsletters sent by Harms in connection with the possible acquisition of these price books were received in evidence.

Included in this evidence was exhibit 95 identified as a letter from Jack Harms dated May 7, 1971, mailed to one Harvester

dealer in each zone in Iowa. This exhibit disclosed, among other things, the cost of reprinting the parts price book at a figure ten percent higher than prices then in existence. It referred to the fact that at a meeting held April 27. it was decided to contact one dealer for each zone for the purpose of explaining this idea and the cost of the project. It placed the responsibility on the dealer to contact the dealers in his zone and collect a fee for the reprinting. It advised the addressees that if enough dealers participated in the program a $100 fee would cover the costs with perhaps a balance to be returned to the dealer. The letter directed the dealers to contact defendants Harms, Hendrickson or a Minnesota dealer in the event they had any questions.

▮ Before exhibit 101 was offered there was sufficient independent proof in the record to warrant the judge in concluding the State had established a prima facie case on the existence of a conspiracy to fix or regulate prices of International repair parts sold in Iowa and of defendants' connection therewith. Thus, one prerequisite for a necessary foundation for admissibility of the exhibit was fulfilled.

Klein's name appears on exhibit 92, a list of those dealers attending the January meeting in Ames. His name also appears on exhibit 135, a list of dealers who paid the $10 fee to cover postage and expenses mentioned earlier. This list was attached to exhibit 94, Harms' report of events which occurred at the March 30 meeting in Ames. This constitutes evidence independent of Klein's declaration which tends to connect him with the conspiracy. It is undisputed Klein's declaration contained in exhibit 101 was made during the pendency of the conspiracy. Exhibit 95, the request from Harms to a dealer in each zone, was binding on other defendants as evidence of efforts to accomplish the object of the conspiracy. It is a fair inference exhibit 101 was Klein's reply to exhibit 95 and indicated a furtherance of the conspiracy. Therefore, the requisite foundation for admissibility of exhibit

101 was established. See Carbo v. United States, 314 F.2d 718, 735, n. 21 (9 Cir. 1963), cert. den., 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498. See also State v. Priebe, 198 Iowa 609, 610–611, 199 N.W. 276, 277; State v. Davis, 230 Iowa 309, 316, 297 N.W. 274, 277, cert. den., 315 U.S. 814, 62 S.Ct. 799, 86 L.Ed. 1212; American Tobacco Co. v. United States, 147 F.2d 93, 118 (6 Cir. 1944), aff'd, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

There remains defendants' contention Klein's declarations and conduct were not admissible since he was neither a defendant nor alleged to be a conspirator. The fact Klein was not a defendant is irrelevant. There is substantial evidence he had associated himself in the prosecution of a common understanding to fix and regulate prices of repair parts with those named as defendants.

▮ Once a prima facie case has been disclosed the declarations and conduct of a co-conspirator whether named as a defendant or not are admissible against defendants under a charge of conspiracy. United States v. Vehicular Parking, 52 F.Supp. 751, 754–755 (D.C.Del.1943), citing Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 249, 38 S.Ct. 65, 72, 62 L.Ed. 260, 275.

Defendants' contention is without merit. The trial court did not err in overruling their objection to exhibit 101.

VIII. Defendants also attack the court's adverse rulings on their objections to the cross-examination of Harms, particularly in reference to letters received from Robert E. Cline (exhibit 108) and Elmo Roe (exhibit 118).

Part of the Cline correspondence stated that at a zone meeting members "voted no to the new parts book subscription. The same problem stopped the majority of us as in the past, we couldn't get a 100 percent to sign up." Cline was not a defendant and did not purchase the books, but was called as a State's witness. Roe's letter stated some dealers in his area "are close to com-

pany stores and are hesitant to go along on the increase. * * *."

In both instances Harms was asked what he thought Cline and Roe meant by what was said in the letters. Defendants objected for the reason the opinion and conclusion of Harms as to what he thought another individual meant was irrelevant and immaterial to prove or disprove any issue in the matter. The objection was overruled.

■■■■ The form of the question is bad. However, a reading of the trial transcript clearly indicates Harms understood the questions called for his interpretation of the Cline and Roe letters and so answered. This view is supported by subsequent answers given by Harms. Finally, the State did get around to asking Harms for his interpretation of the letters. This was proper. The cross-examination was not prejudicial.

Defendants argue their subsequent motion to strike should have been sustained since Cline was neither indicted nor alleged to be a conspirator. The views of this court expressed in division VII are adverse to defendants' contentions.

Defendants' contention in regard to Tomlinson's testimony concerning statements made to him by Miller, an indicted dealer, is also without merit.

■■■■ In another division of their argument defendants insist the court permitted the prosecution to engage in improper tactics by asking argumentative questions, questions assuming facts not in evidence and by using argumentative, improper and prejudicial words to describe the price books. The trial court is vested with broad discretion in determining whether prosecutorial conduct, if any, was sufficient to deprive defendants of a fair trial. This court will interfere only when that discretion has been abused. State v. Horsey, 180 N.W.2d 459, 461 (Iowa 1970); State v. Wright, 203 N.W.2d 247, 251 (Iowa 1972). However, where it appears a fair trial has not been had this court will not hesitate to reverse.

State v. Levy, 160 N.W.2d 460, 467 (Iowa 1968).

■■■■ The court's rulings on evidence in the first trial did not deprive defendants of a fair trial. There was no abuse of the trial court's discretion.

IX. We turn now to those evidentiary rulings adverse to defendants alleged to have occurred during the third trial.

In this connection defendants insist there was no foundation laid for the admission of hearsay statements. In division VII we dealt with the co-conspirators' exception to the hearsay rule when considering defendants' contention stemming from the first trial.

It is our view the judge was warranted in concluding the State had established in the third trial a prima facie case on the existence of a conspiracy to fix or regulate prices when the challenged hearsay was admitted. Other prerequisites for a proper foundation for admissibility of the declarations were sufficiently established to permit receipt of the hearsay.

■■■■ An unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is to fix or regulate prices of articles of merchandise or commodity, is sufficient to establish an unlawful conspiracy under section 553.1, The Code. In support see Interstate Circuit v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610 and authorities cited.

Along this line, all conspirators need not have direct contact with each other. Quirk v. United States, 161 F.2d 138, 141 (8 Cir. 1947).

We find no error.

X. The remaining question in connection with the evidentiary rulings of the trial court concerns statements by the prosecutor during final argument in the first trial.

Defendants assert prejudicial error was committed by the court in permitting the State to display a "color-coded map" which purported to show when the Iowa Harvester dealers consistently began charging the extra ten percent on part prices. Defendants complain the prosecutor was in reality testifying while not under oath about facts ascertainable only by examination of thousands of invoices and comparing with price books and that they had had no opportunity to cross-examine.

The State counters these invoices were properly admitted exhibits about which counsel could comment during final argument and, furthermore, that the map was simply illustrative of what the invoices showed.

As to the map shown to the jury, it has been held there was no error in allowing a county attorney to show a drawing to the jury of what allegedly caused the accident. "As the drawing showed the size and shape of the mound as it was claimed the evidence showed it to be, there was no error in permitting it to be used. * * * [I]t was not offered or used as evidence. It was used simply to illustrate what it was claimed the evidence showed." Stafford v. City of Oskaloosa, 64 Iowa 251, 258, 20 N.W. 174, 178.

Here the invoices had been admitted as exhibits but there was no testimony thereon except in the State's attempted rebuttal which was objected to and sustained. Yet, this map still purported to illustrate what the invoices showed.

■ Furthermore, a prosecutor may "draw conclusions and point out permissible inferences and weaknesses in defendant's testimony." State v. Wesson, 260 Iowa 331, 340, 149 N.W.2d 190, 196. He may do the same in commenting upon the evidence. See State v. Whitfield, 212 N.W.2d 402, 406 (Iowa 1973).

■ The same should logically follow as to the State's argument based upon the invoices.

In State v. McConnell, 178 N.W.2d 386, 390 (Iowa 1970), this court said that in jury arguments counsel is entitled to some latitude in analyzing the evidence admitted in the trial, and he may draw conclusions and point out permissible inferences and weaknesses in defendant's testimony.

■ Generally, a trial court may in its discretion permit counsel, in addressing a jury, to display drawings, diagrams, maps or other visual aids, not put in evidence, for the purpose of illustrating or elucidating matters properly in evidence provided the jury understands that they are employed merely for such purposes and are not of themselves evidence in any sense. Sheets v. Davenport, 181 Neb. 621, 631, 150 N.W.2d 224, 232; Jackson v. Sabuco, 21 Mich.App. 430, 435, 175 N.W.2d 532, 535.

Defendants also assert it was error to allow the jury to have access to "the meaningless bulk exhibits (invoices) during deliberations."

■ "Under modern American practice it is common to allow many types of tangible exhibits to be taken by the jury for consideration during the deliberations, provided that the exhibits have been formally admitted into evidence. The question whether a particular exhibit may be taken by the jury is widely viewed as subject to discretionary control by the trial judge. * * *." McCormick on Evidence, (Second Ed.), section 217, pp. 539–540. See also 2 Underhill's Criminal Evidence, (Fifth Ed.), section 513, page 1291.

■ We find no abuse of the trial court's discretion in the respects urged by defendants.

As pointed out, the conduct of the prosecutor giving rise to defendants' complaint occurred in the first trial. However, in the third trial the court overruled objections allowing the jury to have access to the invoices during deliberations.

We find no abuse of the trial court's discretion as exercised in the third trial.

XI. The remaining issue for review concerns alleged errors in the court's instructions.

Before discussing this issue attention is called to certain rules applicable to the preservation of error in regard to instructions which were repeated in State v. Baskin, 220 N.W.2d 882, 884–886 (Iowa 1974).

Under section 780.35, The Code, rule 196, Rules of Civil Procedure, is made applicable to criminal prosecutions.

■ Rule 196, R.C.P., requires that objections to instructions set out the grounds for complaint. A party objecting has the duty to state what he complains of so the trial court has an opportunity to rule or correct the error which is now argued in this court.

■ The right of a defendant in a criminal case to attack the court's instructions for the first time in motion for new trial is subject to two exceptions: (1) a party may expressly waive the right or (2) if the instruction was correct as given but not as explicit as a party may have desired he must request an additional instruction before the jury is charged.

A party may not rely on a mere refusal to give requested instructions. Rule 196, R.C.P., is just as definite in requiring objections to the refusal of requested instructions to specify the grounds thereof as is required of objections to instructions actually given. The rule requires, in order to predicate error for review upon the trial court's refusal to give requested instructions, proper exceptions must be preserved by the party timely specifying the part of the instruction requested and refused and the particular point or points of law or questions of fact in dispute which the court supposedly erred by omission to instruct.

In one way or another this court has frequently said an objection to an instruction given to a jury should reveal to the trial judge the purported defect to which the objecting party makes complaint and may wish to make the subject matter of attack upon appeal. The objection should be as specific and as penetrating as the stress of the trial permits. The purpose of requiring clarity of objections is not to gratify any possible whim of the trial judge, but to afford the trial judge an opportunity to catch exactly what is in counsel's mind and thereby determine whether the objection possesses merit to an extent the instruction should be recast. In short, a party, upon objecting, must make known to the trial judge the specific objection which he may wish to urge upon appeal. If his objection then taken possesses merit and induces the trial judge to recast his words, a subsequent appeal is avoided. But if he does not disclose what is then in his mind, a needless appeal may be the ultimate result.

■ When a defendant undertakes to except to instructions at trial, as here, he must rest on those exceptions. He cannot in a post-verdict motion amplify or add new ones since it avails a trial court nothing for a defendant to save part of his exceptions for a motion for new trial when the court can no longer change its instructions before reading them to the jury. State v. Buchanan, 207 N.W.2d 784, 787 (Iowa 1973).

Defendants contend instruction 13 expanded the Iowa statute beyond what was intended. In this instruction the jury was told:

"A price fixing conspiracy may consist in any mutual agreement or arrangement or understanding between two or more competitors or others, knowingly made, to sell at a uniform price, or to raise, or lower, or stabilize prices. So, a common plan or understanding, knowingly made, or arranged, or entered into between two or more competitors, to adopt or follow or adhere to any pricing formula which will result in raising, or lowering, or maintaining at fixed levels, prices charged for goods, such as tractor or machinery parts, would constitute a price fixing conspiracy."

Defendants urge the words "stabilize" and "pricing formula" extend the statute illegally. They cite Rohlf v. Kasemeier, 140 Iowa 182, 118 N.W. 276, for the proposition section 553.1 must be strictly construed. They infer the phrase "regulate or fix" does not entail stabilization or pricing formulas.

The word "fix" is defined in Webster's New Twentieth Century Dictionary 694 (Second Ed. 1964) as (1) "to make stable, firm, or secure * * * (2) to establish, set, to arrange definitely, as he *fixed* the rent at forty dollars." (Emphasis in original).

"Regulate," likewise, is defined as (1) "to control, direct, or govern according to a rule, principle, or system * * * (4) to make uniform, methodical; orderly, etc." *Id.,* page 1522.

■ Undoubtedly, the definition employed by the trial judge reasonably falls within the meaning of regulating or fixing. While self-explanatory terms need not be defined, "the fact that the court makes an unnecessary explanation of a correct instruction is not an abuse of discretion, if the explanation is not prejudicial to accused." 23A C.J.S. Criminal Law § 1191, p. 487.

■ "In defining an offense the court may fit the definition to the facts in the case as the evidence tends to show such facts to be." 23A C.J.S. Criminal Law § 1194, p. 495. See also State v. DiPaglia, 247 Iowa 79, 86–87, 71 N.W.2d 601, 605.

Since the court did not define something not included within the meaning of price regulating or fixing, but simply made clearer what the terms entail, it is difficult to comprehend how defendants were prejudiced.

We find no error here.

XII. Defendants also contend instructions 15, 16, 17 and 18 were erroneous and "sealed the fate of defendants." Basically, these instructions dealt with the propositions: (1) there was no need to prove intent to disobey the law, (2) knowledge of such law violation is unnecessary, (3) laudable motive is irrelevant, and (4) the carrying into effect of the conspiracy is immaterial.

Admitting these are not defenses to the crime, defendants assert such instructions were unnecessary, as these concepts were not asserted as *defenses*.

■ This argument is without merit. Even if defendants did not raise these ideas as defenses, the instructions define what conspiracy is not. They do not give the impression a conspiracy did in fact exist or that defendants were guilty.

■ Furthermore, such evidence was adduced by defendants. It was pointed out the books were handed out in broad daylight, no letters concerning the books were stamped secret and the books were normally in plain sight at dealerships. Defendants testified their profit margins were down due to various factors. Thus, the trial court was correct in putting this evidence in its proper perspective as to the law of conspiracy. Otherwise the jury might have been misled into thinking these were valid "defenses."

Defendants' argument is not persuasive. The giving of the instructions under attack in this division does not warrant a reversal.

The instructions in the third trial were the same as in the first with the following exceptions: the final paragraph of 14 relating to dealer price-study exhibits was omitted; 19 and 20 were renumbered 21 and 22 and a new instruction 19 was added relating to hearsay testimony.

In reaching the conclusion defendants' complaints as to the court's instructions do not require reversal, only those objections and exceptions which have been properly preserved for review have been considered.

Those matters raised for the first time in this court present nothing for review.

Every contention and assertion of defendants preserved for review have been considered whether specifically mentioned in this opinion or not. Both cases are

Affirmed.

All Justices concur except REYNOLDSON and McCORMICK, JJ., who take no part.